UNITED STATES of America, Plaintiff,

v.

W. Keith WOODMANSEE and Teresa Woodmansee, Defendants.

No. C–74–1346.

United States District Court, N. D. California.

Jan. 15, 1975.

James L. Browning, Jr., U. S. Atty., Martin A. Schainbaum, Asst. U. S. Atty., Tax Div., San Francisco, Cal., for plaintiff.

W. Keith Woodmansee, Walnut Creek, Cal., for defendants.

## MEMORANDUM OF OPINION AND ORDER

RENFREW, District Judge.

This is a civil action brought by the United States of America pursuant to Section 7405, Int.Rev.Code of 1954, to recover erroneous refunds of income taxes paid to W. Keith and Teresa Woodmansee ("taxpayers"). Federal jurisdiction over the subject matter arises under 28 U.S.C. §§ 1340, 1345.

Taxpayers filed a motion to dismiss the complaint for failure to state a claim entitling the Government to relief. Subsequently plaintiff filed a motion for summary judgment. Pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, the Court has treated taxpayers' motion as one for summary judgment.

■ Defendant W. Keith Woodmansee ("Woodmansee") was a flight engineer for Pan American Airlines whose duties resulted in service on Pan American's foreign air routes.[1] With the exception of a period from late 1960 until early 1964, Woodmansee resided in and was based in the United States. During the 1961–1963 period he resided abroad and claims he flew as a flight engineer entirely within German air space. During 1961, 1962 and 1963 he paid German income taxes on his wages and apparently was exempted from United States income taxes.[2]

In 1960 and 1964 taxpayers elected to take the benefits of Section 901 of the Internal Revenue Code of 1954 and took a foreign tax credit against their United States income tax for those years on the basis of the German income tax which they paid. On their 1965 income tax return taxpayers took an additional foreign tax credit of $56 representing German income tax withheld by Pan American for income earned by Woodmansee during the 1960–1964 period.[3]

In 1971 taxpayers elected to utilize the foreign tax credit carryover provisions of Section 904(d), Int.Rev.Code of 1954. Accordingly, they filed amended United States income tax returns for

---

1. Woodmansee flew solely on routes between a point in the United States and a point in a foreign country or between two points, both of which were in foreign countries. Pan American Airlines has no domestic flights (i. e., flights between two points both of which are in the United States). The mere fact that Woodmansee flew solely on foreign air routes does not by itself render all of his income from services rendered on those flights foreign source income. See note 24, *infra*.

2. The Court does not have before it nor does it rule on the propriety of this exemption from the United States income tax. It does note that taxpayers allege the exemption arose pursuant to Section 911, Int.Rev.Code of 1954.

3. Taxpayers have not specifically attributed this $56 of German income tax to any one year in the 1960–1964 period because of the failure of Pan American to provide them with this information.

1964, 1965, 1966, and 1967.[4] In effect, taxpayers took against United States income taxes for 1964–1967 a direct credit for all of the German income taxes which were paid during the 1961–1963 period. Because taxpayers paid no United States income tax for the 1961–1963 period, this dollar-for-dollar reduction resulted in a windfall tax shelter in excess of $8,100. Subsequently, the Internal Revenue Service paid the claims for refund after auditing the amended return and making minor adjustments.

The Internal Revenue Service issued four separate refund checks. In its complaint the Government alleges that the refund check for the 1966 amended return was issued on or about June 26, 1972. Woodmansee, however, alleges that he received the refund check on June 24, 1972. It appears from an affidavit that the check in question was dated June 23, 1972, and was inscribed by taxpayers' bank with the date June 26, 1972.[5] The complaint in this action was filed on June 26, 1974.

The Government contends that as a matter of law the refunds in question were erroneous because the amended returns were filed after the statutory deadline prescribed by § 6511(a), Int.

Rev.Code of 1954.[6] Taxpayers, however, contend that the applicable statutory limitation is prescribed by § 6511 (d)(3)(A) and therefore that their claim is not barred by the statute of limitations. Additionally, they contend that § 6532(b) bars the Internal Revenue Service suit as to the 1966 refund payment. The Court agrees with this last contention and grants summary judgment for taxpayers as to the 1966 refund. However, the Court finds that as a matter of law taxpayers are not entitled to utilize the benefits of the foreign tax credit provisions under the circumstances of this case and hence grants the Government's motion for summary judgment as to the 1964, 1965, and 1967 refunds.

The issues before the Court are the following:

1. Are taxpayers entitled to the benefits of § 901 even if the 10-year limitation period is applicable?

2. Does § 6532(b) bar the Government from bringing suit to collect the 1966 refund?

Section 901 provides that a taxpayer may elect, subject to the limitations of § 904, to take a tax credit against his United States income tax for the amount

4.

| Tax Year | Tax Paid | Amended Return Filed | Additional Foreign Tax Credit Claimed | Refund Paid |
|---|---|---|---|---|
| 1964 | 1703 | 10/21/71 | 1614 | 1583.95 |
| 1965 | 2176 | 10/21/71 | 1980 | 2734.92 |
| 1966 | 2534.26 | 10/21/71 | 2407 | 3153.01 |
| 1967 | 1598 | 2/25/72 | 37 | 689.31 |

5. A photostatic copy of the deposit slip used by taxpayers to deposit the check in question is both rubber stamped and inscribed with the date June 26, 1972. However, taxpayers alleged in an affidavit that they deposited the check on June 24, 1972, and the deposit slip was so dated. See Affidavit in Support of Response to Plaintiff's Motion for Summary Judgment, dated September 6, 1974. The Court finds highly credible the handwritten date on the deposit slip. It is highly unlikely that taxpayers considered the statute of limitations ramifications at the time of the deposit of the check.

6. During oral argument the Government did not address itself to the question of the applicability of the foreign tax credit provisions to the present factual situation. In fact, Government counsel conceded that absent prohibition by § 6511(a), taxpayers were entitled to utilize the foreign tax credit provisions. Upon questioning by the Court, Woodmansee addressed his argument to this issue. Because a careful review of the case law and legislative history led the Court to the tentative view that the provisions were inapplicable to the instant case, the Court advised the parties to file supplementary briefs on this issue. Subsequent to the filing of these briefs, the Court heard further oral argument on this issue on December 5, 1974. At this hearing Woodmansee requested leave to file an additional brief ten days subsequent to the hearing. This request was granted by the Court. The Government filed a responsive brief on December 12, 1974.

of any income taxes paid or accrued during the taxable year to any foreign country.[7] Section 904(a) establishes two alternate limitations on the size of the foreign tax credit.[8] The overall limitation elected by taxpayers in the instant case provides that the foreign tax credit shall not exceed that same proportion of taxpayers' United States tax which taxpayers' foreign source taxable income bears to their entire taxable income for the same taxable year. Section 904(d) establishes a carryback and carryover provision for that part of the foreign tax credit which taxpayers are unable to utilize due to the limitations prescribed in § 904(a).[9] Section 275(a) provides that a taxpayer cannot take a

---

7. Section 901 provides in pertinent part:

"(a) Allowance of credit.—If the taxpayer chooses to have the benefits of this subpart, the tax imposed by this chapter shall, subject to the applicable limitation of section 904, be credited with the amounts provided in the applicable paragraph of subsection (b) plus, in the case of a corporation, the taxes deemed to have been paid under sections 902 and 960. Such choice for any taxable year may be made or changed at any time before the expiration of the period prescribed for making a claim for credit or refund of the tax imposed by this chapter for such taxable year. The credit shall not be allowed against the tax imposed by section 56 (relating to minimum tax for tax preferences), against the tax imposed by section 531 (relating to the tax on accumulated earnings), against the additional tax imposed for the taxable year under section 1333 (relating to war loss recoveries) or under section 1351 (relating to recoveries of foreign expropriation losses) or against the personal holding company tax imposed by section 541.

"(b) Amount allowed.—Subject to the applicable limitation of section 904, the following amounts shall be allowed as the credit under subsection (a):

"(1) Citizens and domestic corporations.—In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States * * *."

8. Section 904(a) provides in pertinent part:

"(1) Per-country limitation.—In the case of any taxpayer who does not elect the limitation provided by paragraph (2), the amount of the credit in respect of the tax paid or accrued to any foreign country or possession of the United States shall not exceed the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources within such country or possession (but not in excess of the taxpayer's entire taxable income) bears to his entire taxable income for the same taxable year.·

"(2) Overall limitation.—In the case of any taxpayer who elects the limitation provided by this paragraph, the total amount of the credit in respect of taxes paid or accrued to all foreign countries and possessions of the United States shall not exceed the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources without the United States (but not in excess of the taxpayer's entire taxable income) bears to his entire taxable income for the entire taxable year."

9. Section 904(d) provides:

"(d) Carryback and carryover of excess tax paid.—Any amount by which any such tax paid or accrued to any foreign country or possession of the United States for any taxable year beginning after December 31, 1957, for which the taxpayer chooses to have the benefits of this subpart exceeds the applicable limitation under subsection (a) shall be deemed tax paid or accrued to such foreign country or possession of the United States in the second preceding taxable year, in the first preceding taxable year, and in the first, second, third, fourth, or fifth succeeding taxable years, in that order and to the extent not deemed tax paid or accrued in a prior taxable year, in the amount by which the applicable limitation under subsection (a) for such preceding or succeeding taxable year exceeds the sum of the tax paid or accrued to such foreign country or possession for such preceding or succeeding taxable year and the amount of the tax for any taxable year earlier than the current taxable year which shall be deemed to have been paid or accrued in such preceding or subsequent taxable year (whether or not the taxpayer chooses to have the benefits of this subpart with respect to such earlier taxable year). Such amount deemed paid or accrued in any year may be availed of only as a tax credit and not as a deduction and only if taxpayer for such year chooses to have the benefits of this subpart as to taxes paid or accrued for that year to foreign countries or possessions. For purposes of this subsection, the terms 'second preceding taxable year' and 'first preceding taxable year' do not include any taxable year beginning before January 1, 1958."

deduction for any foreign taxes as to which he has taken a foreign tax credit.[10]

## I. *Applicability of the Foreign Tax Credit*

A literal reading of the foreign tax credit provisions of the Code and the regulations promulgated thereunder would in the absence of any other considerations result in the applicability of the credit in the instant case. However, it is the duty of the Court to interpret Code provisions consonant with Congress' legislative purpose. *See generally* Gregory v. Helvering, 293 U.S. 465, 469–470, 55 S.Ct. 266, 79 L.Ed. 596 (1935). It is manifestly clear from both the legislative history and the subsequent case history that the primary purpose of the foreign tax credit provisions was to prevent double taxation of the income of taxpayers whose business activi-ties were subject to taxation by both foreign countries and the United States. The predecessor to Section 901 first appeared in the Revenue Act of 1918. At that time Congress recognized that if a taxpayer's income was subject to both the United States income tax and a foreign income tax, he would be subject to such a severe tax burden that the effective rate would approach a confiscatory level.[11] Congress also realized that the resulting double taxation would place United States taxpayers at a competitive disadvantage and would tend to constrain American trade abroad.[12] When the Internal Revenue Code of 1954 was enacted, Congress reiterated that the foreign tax credit provisions were designed to prevent double taxation of foreign source taxable income by treating taxes imposed by a foreign country as if they were imposed by the United States.[13]

10. Section 275(a) provides:
"(a) General rule.—No deduction shall be allowed for the following taxes:
\*    \*    \*    \*    \*
· "(4) Income, war profits, and excess profits taxes imposed by the authority of any foreign country or possession of the United States, if the taxpayer chooses to take to any extent the benefits of section 901 (relating to the foreign tax credit)."

11. The House of Representatives in its report on the Revenue Act of 1918 said:
"Under existing law a citizen of the United States can only deduct income war or excess profits taxes paid to a foreign country from gross income in computing net income. With the corresponding high rates imposed by certain foreign countries the taxes levied in such countries in addition to the taxes levied in the United States upon citizens of the United States place a very severe burden upon such citizens. The bill provides that a credit against the income tax imposed in the United States be allowed a citizen of the United States subject to income and war or excess profits taxes in a foreign country of an amount equal to the tax paid in such country upon income that is received from sources within such country." H.R.Rep.No. 767, 65th Cong., 2d Sess., p. 11.

12. The following statement was made in a report of the House of Representatives in relation to the Revenue Act of 1921:
"Under existing law an American citizen or domestic corporation is taxed upon his or its entire income even though all of it is derived from business transacted without the United States. This results in double taxation, places American business concerns at a serious disadvantage in the competitive struggle for foreign trade, and encourages American corporations doing business in foreign countries to surrender their American charters and incorporate under the laws of foreign countries." H.R.Rep.No.350, 67th Cong., 1st Sess., p. 8.
The provisions which this statement accompanied did not deal with foreign tax credits, but rather excluded from taxable income certain foreign source income of certain taxpayers engaged in foreign business. However, both that provision and the foreign tax credit are means by which the above-stated policy could be implemented and hence it is immaterial that the statement did not accompany a foreign tax credit provision.

13. The House Report accompanying the bill stated:
"Credit is allowed under existing law against United States tax liability for income taxes paid abroad. This provision gives foreign countries a prior tax claim on the income of United States enterprises operating abroad, and in effect treats the taxes imposed by the foreign country as if they were imposed by the United States. The provision was originally designed to produce uniformity of tax burden among United States taxpayers, irrespective of whether they were

■ Congress found it immediately necessary to correct an abuse which arose out of the predecessor foreign tax credit provision. Utilization of the foreign tax credit by a taxpayer where the foreign tax rate was higher than the United States rate resulted in the credit sheltering United States source income from the United States tax properly attributable to it. In order to eliminate this abuse, Congress enacted the predecessor provision to the overall and per-country limitations found in Section 904(a).[14] These provisions limited the credit to the United States tax attributable to the taxpayers' foreign source income. Congress did not intend to mitigate high foreign tax rates but rather intended only to shield taxpayers from foreign taxes to the extent that they duplicated the United States income tax burden.[15]

■ It was not until 1958 that Congress enacted the foreign tax credit carryback and carryover provisions.[16] The purpose of most carryback and carryover provisions in the Internal Revenue Code is to mitigate the effect of taxing on an annual basis as opposed to some other time frame.[17] Yet that rationale is inapposite in the case of a foreign tax credit, because the time period over which taxable income is computed has no impact on double taxation. Double taxation is concerned solely with whether a particular dollar of taxable income is being taxed by both the United States and foreign entities, and this question is completely independent of any subsequent or prior events.[18] Congress did not intend to shield taxpayers from higher foreign tax rates and thus vitiate the effect of the limitations provisions found in § 904(a). See footnotes 14 and 15, *supra*. If Congress had wanted to foster that purpose, it could have repealed those limitation provisions.[19] The legislative reports ac-

engaged in business in the United States or engaged in business abroad." H.R.Rep.No. 1337, 83d Cong., 2d Sess., p. 76, U.S.Code Cong. & Admin.News 1954, p. 4103.

14. The House of Representatives explained the rationale behind the limitation provisions stating:
"The income tax law allows a credit, dollar for dollar, against our tax for any income or profits taxes paid to any foreign country or to any possession of the United States, with certain modifications in the case of alien residents of the United States. Where foreign income or profits taxes are imposed at rates higher than those carried by the similar taxes in this country, this credit may wipe out part of our tax properly attributable to income derived from sources within the United States. To prevent this abuse, section 228 provides that in no case shall the amount of this credit exceed the same proportion of our tax which the taxpayer's net income from sources within the United States bears to his entire net income." H. R.Rep.No.350, 67th Cong., 1st Sess., p. 13.

15. H.R.Rep.No.855 which accompanied the Internal Revenue Code of 1939 stated:
"The limitations on the allowance of a credit for taxes paid to foreign countries were placed in the law to make it certain that the Federal Government would receive its full tax on the income from United States sources. It was not intended for the Ameri-

can tax to apply against the income from foreign sources unless the foreign tax rate was less than the tax rate imposed by the United States." H.R.Rep.No.855, 76th Cong., 1st Sess., p. 5.

16. Int.Rev.Code of 1954, § 904(d).

17. See, *e. g.*, Int.Rev.Code of 1954, § 172, § 381 et seq., § 1212, § 1301 et seq.

18. The operating loss carryback and carryover provisions are necessary because of the way in which our tax system defines income (*viz.* income equals economic gain minus economic loss for the taxable period). Under this definition, income cannot be determined by the consideration of a single economic transaction but rather is dependent upon all prior and subsequent transactions in the taxable period. Administrative and governmental revenue needs require collection of taxes on an annual basis. These carryback and carryover provisions merely recognize the fact that an equitable tax system necessitates a longer taxable period than one year.

19. It could conceivably be argued that rather than repealing the limitation provisions found in § 904(a), Congress wanted to require the taxpayer to spread over several years that part of the tax credit arising from higher foreign tax rates. Yet this argument must fall under careful analysis. It would border on the nonsensical to shield

companying the 1958 Amendment to the Internal Revenue Code show that § 904(d) was intended to apply to one particular set of circumstances. Congress realized that double taxation was possible notwithstanding the foreign tax credit provisions because of differences in reporting income in the United States and certain foreign countries. If in a given period foreign source income was reportable in the foreign country but not in the United States, double taxation could result. In period one although a foreign tax credit would arise from the payment of foreign income taxes, the § 904(a) limitation provisions would preclude the utilization of the credit in that period because for United States tax purposes there would be no taxable for-

eign source income. In period two when the limitation would allow a large credit, because there would be no payment of a foreign tax, no credit would arise. Section 904(d) represents an attempt by Congress to eliminate double taxation in such a case.[20] Allowance of a windfall tax saving by a taxpayer because of Congressional imprecision in drafting would emasculate the legislative purpose underlying the foreign tax credit provisions.

■ The cases construing the foreign tax credit provisions do not support a contrary interpretation. Many courts have found that "the primary design of the [foreign tax credit] provision was to mitigate the evil of double taxation."

taxpayers from higher foreign tax rates *only* when they had foreign source income in the carry years which was not subject to foreign tax. It would be patently absurd to attribute *such an intent to Congress*.

20. That Congress enacted § 904(d) with this intent is clearly demonstrated by the House Report for the Technical Amendments Act of 1957 which stated:

"Double taxation can occur at present because of the manner in which this country-by-country limitation works where the methods of reporting income are different in the United States and the foreign country. These differences may result in the same income being reported in one year in the United States and in another year in the foreign country. When this occurs the foreign tax credit available will tend to be less than the taxes paid or accrued to the foreign country in the year the income is reported in that country but not in the United States. In another year when this income is reported in the United States but not the foreign country, the credit which would be available under the limitation will tend to exceed the foreign taxes paid or accrued. Illustrations of the factors which may result in a difference in the timing or reporting of income and allowance of deductions are:

"(1) Reporting of taxable income from sales on the installment basis in the United States without being permitted to report in a similar manner in a foreign country (or possession of the United States);

"(2) Differences under the laws of the United States and those of the foreign country in the pricing of inventories (this may result in the reporting of income

from the ultimate sale of such articles in a different year in the United States than in the foreign country);

"(3) Differences in reporting foreign exchange profit or loss (such profit or loss may be reported on the accrual basis in the United States but only on the cash basis in some foreign countries);

"(4) Differences in depreciation methods in the United States and in the foreign country;

"(5) The requirement of some countries that income taxes be determined only on a fiscal-year basis; and

"(6) The use of an averaging device in the computation of taxable income in certain foreign countries covering more than 1 taxable year.

"To eliminate the double taxation existing under present law, this section adds a new subsection to section 904 of of the code to permit foreign taxes which cannot be claimed currently as a tax credit as a result of the country-by-country limitation to be carried back successively to the 2 prior years and then forward to the 5 succeeding years and used in these years to the extent the foreign taxes for such years are less than the amount allowable under the country-by-country limitation."

H.R.Rep.No.775, 85th Cong., 1st Sess., pp. 27–28. The provision was originally enacted by the House and then deleted in the Senate version of the bill. S.Rep.No.1983, 85th Cong., 2d Sess., pp. 117–118 (1958). Subsequently, the Conference Committee restored the provision without any comment as to statutory purpose. See Conference Report No. 2632, 85th Cong., 2d Sess., p. 31 (1958). The Congressional intent could not have been more clearly and explicitly stated.

Burnet v. Chicago Portrait Co., 285 U.S. 1, 7–8, 52 S.Ct. 275, 277, 76 L.Ed. 587 (1931); Rinehart v. United States, 429 F.2d 1286, 1288 (10th Cir. 1970); Associated Telephone & Telegraph Co. v. United States, 306 F.2d 824, 832 (2d Cir. 1962); Federated Mutual Implement & Hard. Ins. Co. v. Commissioner, 266 F.2d 66, 69 (8th Cir. 1959); Gordon Duke, 34 T.C. 772, 775 (1960); Mary A. Marsman, 18 T.C. 1, 12 (1952), modified, 205 F.2d 335 (4th Cir. 1953). Furthermore, it was not the purpose of the foreign tax credit provisions to relieve taxpayers from bearing the full United States tax burden attributable to income arising from sources within this country. Associated Telephone & Telegraph Co. v. United States, supra, 306 F.2d at 832. In deciding whether a final liquidating distribution by a foreign subsidiary to a domestic corporation constituted a "dividend" for the purposes of § 902(a), the court has stated that "[t]o allow the credit here would facilitate a convenient scheme for avoiding the United States income tax * * *. No Congress from 1913 to the present ever 'intended' such a result." Associated Telephone & Telegraph Co. v. United States, supra, 306 F.2d at 833.

Although a literal reading of the statutory provisions would support taxpayers' contention as to the applicability of the foreign tax credit in the instant case, the courts have held that they will follow the clearly stated purpose underlying the legislation where a literal construction would produce absurd or futile results or where it would produce unreasonable results plainly at variance with the policy of the legislation as a whole. United States v. American Trucking Associations, 310 U.S. 534, 543–544, 60 S. Ct. 1059, 84 L.Ed. 1345 (1940); Mary A. Marsman, supra, 18 T.C. at 12.[21]

▆▆▆ The Court holds that the foreign tax credit prescribed in § 901 cannot arise out of foreign taxes paid or accrued on income which is exempt from the United States income tax.[22] It is further held that the foreign tax credit carryback and carryover provisions found in § 904(d) are applicable only as to income which is reportable in different time periods in the United States and the foreign country in question.[23] Accordingly, the Government's motion for summary judgment is granted with respect to the 1964, 1965, and 1967 refund checks.[24]

21. In Associated Telephone & Telegraph Co. v. United States, supra, 306 F.2d at 833, the court said that on those occasions when circumstances arise in which the statutory scheme fails to operate in accordance with the policies which created it, there is no excuse for failing to effectuate those policies.

22. In Rinehart v. United States, supra, 429 F.2d at 1288, the taxpayer paid Puerto Rican income taxes attributable to prior years when no United States tax liability existed. The court held that since the taxpayer had no taxable foreign source income, the § 904(a)(1) limitation barred utilization of the foreign tax credit. The court also stated: "Again the design of such provision is to mitigate the evil of double taxation. [citations omitted] Here appellants fail to show that the Puerto Rican earnings were subject to federal income taxation. Thus the credit sought under § 901 is not available." Rinehart v. United States, supra, 429 F.2d at 1288.

23. It should be noted that either holding will independently dispose of the present factual situation on the merits.

24. It is important to note that even without the above holdings the Government would partially prevail on its motion for summary judgment. The reasons for this are twofold. First, § 904(d) could be read to require that the unused foreign tax credits from 1961–1964 be carried back to 1959 and 1960 regardless of whether the taxpayers can presently assert the right to a refund for those early years. Thus, in the instant case, taxpayers may, because of the statute of limitations, have lost that part of the credit to which they were earlier entitled. Second, a proper judicial construction of "taxable income from sources outside the United States" may impose a § 904(a) limitation which will reduce the amount of the credit which taxpayers were initially allowed for 1964–1967. Woodmansee's assertion that 87% of his income during the 1964–1967 period was foreign source income is not clearly supported in the record. See his affidavit filed December 23, 1974. The test to determine what constitutes foreign source income is based on where the taxpayer rendered his services. See Tipton & Kalmbach, Inc. v.

The Court notes that the Internal Revenue Service has issued three apparently contradictory revenue rulings. See Rev.Rul. 72–126, 1972–1 Cum.Bull. 217; Rev.Rul. 68–622, 1968–2 Cum.Bull. 298; Rev.Rul. 54–15, 1954–1 Cum.Bull. 129. In Rev.Rul. 72–126 the Internal Revenue Service held that a tax credit arose out of a foreign tax attributable to income exempt from the United States income tax pursuant to § 911 and that the credit so arising could be carried back and forward in accordance with Treas.Reg. § 1.904–2(b)(2)(i). This holding was based on the authority of Rev.Rul. 54–15 which held that a foreign tax credit allowed under the predecessor section to § 901 was limited in application only as provided by the predecessor to § 904(a). Finally, Rev. Rul. 68–622 held that in determining the foreign tax credit, the foreign income tax paid by the domestic company to the foreign country is not reduced by the tax attributable to income taxed in the foreign country but not taxed in the United States. This ruling was also based solely on Rev.Rul. 54–15. However, at the time Rev.Rul. 54–15 was issued, the carryback and carryover provisions had not yet been enacted.[25] Furthermore, the reasoning and holdings in the instant case are dispositive of the issues present in the rulings and hence the rulings are disapproved and overruled to the extent they are contradictory.[26]

Finally, in Helvering v. Campbell, 139 F.2d 865, 870 (4th Cir. 1944), the court held that the taxpayer was entitled to deduct the entire amount of the Philippine income tax he paid notwithstanding the fact that certain items excluded in computing the taxable income of the taxpayer under federal law were not so excluded under Philippine law. However, the instant case is at least partially distinguishable on its facts from *Campbell*. There the court merely found that where there was only one income generating activity, it would be irrelevant that the foreign country's definition of the tax base was larger. The court could have felt that defining a larger tax base was an indirect method of imposing a higher rate structure. Thus, as long as the same revenues and income generating activities were being taxed, the § 904(a) limitation would prevent any abuses. It should be noted that the carryback and carryover provisions were not in effect during the years in question and hence the question of the construction of § 904(d) was not before the court in *Campbell*. Nevertheless, to the extent that *Campbell* contradicts this opinion, it is disapproved and not followed.[27]

United States, 480 F.2d 1118, 1120–1121 (10th Cir. 1973); 26 U.S.C. § 861 et seq.; Treas.Reg. § 1.901–2(d), § 1.861–4, § 1.-862–1. However, these issues are not now before the Court and we leave their resolution for a later day.

25. Clearly Rev.Rul. 54–15 is not determinative of the instant case. Since Rev.Rul. 68–622 and Rev.Rul. 72–126 are based solely on Rev.Rul. 54–15, they are also not dispositive of this case.

26. This Court is not bound by administrative regulations or rulings construing the foreign tax credit provisions where they are not supported by valid reasons and are contrary to the legislative purpose. Burnet v. Chicago Portrait Co., *supra*, 285 U.S. at 16, 21, 52 S.Ct. 275.

27. The Government contends that the refunds in question were erroneously made as a matter of law because they were made after the expiration of the applicable period of limitation. See Int.Rev.Code of 1954, § 6514. Whether this contention is correct depends on whether the limitation in § 6511(a) or that in § 6511(d)(3)(A) is applicable. Were this question before the Court, it would conclude that taxpayers are correct when they contend that § 6511(d)(3)(A) is the applicable limitation.

Where a taxpayer seeks a refund of an overpayment of taxes attributable to a recalculation of a foreign tax credit, the applicable limitation period is the ten-year period found in § 6511(d)(3)(A). Morrison-Knudsen Co., Inc. v. United States, 22 A.F.T.R.2d 5757, 5758 (N.D.Cal., September 20, 1968); Rev.Rul. 68–150, 1968–1 Cum.Bull. 564, 565. Here the taxpayers' application for a refund might be construed as "the discovery of creditable taxes which were not reported on the income tax return when filed." Rev.Rul. 68–150, 1968–1 Cum.Bull. 564, 565. Thus,

## II. *The § 6532(b) Limitation*

Section 6532(b) of the Internal Revenue Code of 1954 provides that a suit for the recovery of an erroneous refund pursuant to § 7405 must be brought within two years after the making of such a refund.[28] It is clear that the two-year period in § 6532(b) runs from the making of the payment and not from the allowance of the refund. United States v. Wurts, 303 U.S. 414, 418, 58 S.Ct. 637, 82 L.Ed. 932 (1938); United States v. Fairbanks, 95 F.2d 794, 795 (9th Cir. 1938), aff'd., 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855 (1939). The real issue before this court is what constitutes "the making of the payment." The Government contends that payment is made when all events have been fixed which will permit the taxpayer to obtain the cash equivalent of the refund check, while taxpayers contend that payment is made when they receive the refund check. The Court agrees with taxpayers and hence grants their motion for summary judgment as to the 1966 refund.

At a minimum, payment is deemed made upon the ripening of a legal obligation on the part of the Internal Revenue Service to the taxpayer. *See* United States v. Wurts, *supra,* 303 U.S. at 417–418, 58 S.Ct. 637. Such a legal obligation would arise at that moment when an account stated arises. United States v. Wurts, *supra,* 303 U.S. at 417–418, 58 S.Ct. 637. Since the receipt of the refund check gave rise to an account stated, the date of receipt (June 24, 1972) is the date of the making of payment. *See* Daube v. United States, 289 U.S. 367, 370–372, 53 S.Ct. 597, 77 L.Ed. 1261 (1933). Acceptance of the account balance did not require the taxpayer to obtain the cash equivalent of the check.[29] Acceptance was manifested by taxpayers' request for a refund. The receipt of the refund check constituted acceptance at least as to the amount of the check. *Cf.* United States v. A. S. Krieder Co., 313 U.S. 443, 449, 61 S.Ct. 1007, 85 L.Ed. 1516 (1941).

The courts have held that "the making of such refund" should be construed in accordance with the common understanding of those words. United States v. Wurts, *supra,* 303 U.S. at 417, 58 S.Ct. 637; Paulson v. United States, 78 F.2d 97, 99 (10th Cir. 1935). Since refund means to pay back, return, restore, and/or make restitution, then such a return or restoration is made when the check in payment of the obligation is delivered. Paulson v. United States, *supra,* 78 F.2d at 99.

Furthermore, basic policy considerations mandate this result. A construction based upon final payment as defined in the Uniform Commercial Code § 4–213 would result in a nonuniform date of payment. There would be a different date depending upon whether the taxpayer cashed the refund check in a currency exchange, deposited it in his checking or savings account, or merely stored it in a shoebox. Also, a difference in banking laws would result in different payment dates. Accordingly, the Court holds that the § 6532(b) limitations period runs from the date of delivery of the refund check.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law as required by Rule 52(a), Federal Rules of Civil Procedure.

It is hereby ordered, adjudged and decreed that the Government's motion for

---

had the merits of this case been decided differently, the Government would have lost on its limitations argument.

28. Section 6532(b) provides:
"Recovery of an erroneous refund by suit under section 7405 shall be allowed only if such suit is begun within 2 years after the making of such refund, except that such suit may be brought at any time within 5 years from the making of the refund if it appears that any part of the refund was induced by fraud or misrepresentation of a material fact."

29. Certainly the Internal Revenue Service would owe no obligation to a taxpayer who upon receipt of a refund check placed it in a shoebox and never deposited it in a bank for collection.

summary judgment is granted as to the 1964, 1965 and 1967 refunds.

It is hereby further ordered, adjudged and decreed that taxpayers' motion for summary judgment is granted as to the 1966 refund.

It is hereby further ordered that plaintiff prepare a form of judgment in accordance with this Memorandum of Opinion.