## O'GILVIE ET AL., MINORS *v.* UNITED STATES

No. 95–966.   Argued October 9, 1996—Decided December 10, 1996*

---

*Together with No. 95–977, *O'Gilvie* v. *United States*, also on certiorari to the same court.

*Stephen R. McAllister* argued the cause for petitioners in No. 95–966. With him on the briefs were *Robert M. Hughes, Jack D. Flesher, Gregory L. Franken,* and *David B. Sutton. Linda D. King* argued the cause and filed briefs for petitioner in No. 95–977.

*Kent L. Jones* argued the cause for the United States. With him on the briefs were *Solicitor General Days, Acting Solicitor General Dellinger, Assistant Attorney General*

*Argrett, Deputy Solicitor General Wallace, Kenneth L. Greene*, and *Kenneth W. Rosenberg.*

JUSTICE BREYER delivered the opinion of the Court.

Internal Revenue Code § 104(a)(2), as it read in 1988, excluded from "gross income" the

> "amount of any *damages received* (whether *by suit* or agreement and whether as lump sums or as periodic payments) *on account of personal injuries or sickness.*" 26 U. S. C. § 104(a)(2) (emphasis added).

The issue before us is whether this provision applies to (and thereby makes nontaxable) punitive damages received by a plaintiff in a tort suit for personal injuries. We conclude that the punitive damages received here were not received *"on account of"* personal injuries; hence the provision does not apply, and the damages are taxable.

## I

Petitioners in this litigation are the husband and two children of Betty O'Gilvie, who died in 1983 of toxic shock syndrome. Her husband, Kelly, brought a tort suit (on his own behalf and that of her estate) based on Kansas law against the maker of the product that caused Betty O'Gilvie's death. Eventually, he and the two children received the net proceeds of a jury award of $1,525,000 actual damages and $10 million punitive damages. Insofar as the proceeds represented punitive damages, petitioners paid income tax on the proceeds but immediately sought a refund.

The litigation before us concerns petitioners' legal entitlement to that refund. Procedurally speaking, the litigation represents the consolidation of two cases brought in the same Federal District Court: Kelly's suit against the Government for a refund, and the Government's suit against the children to recover the refund that the Government had made to the children earlier. 26 U. S. C. § 7405(b) (authoriz-

ing suits by the United States to recover refunds erroneously made).   The Federal District Court held on the merits that the statutory phrase "damages . . . on account of personal injury or sickness" includes punitive damages, thereby excluding punitive damages from gross income and entitling Kelly to obtain, and the children to keep, their refund.   The Court of Appeals for the Tenth Circuit, however, reversed the District Court.   Along with the Fourth, Ninth, and Federal Circuits, it held that the exclusionary provision does not cover punitive damages.   66 F. 3d 1550 (1995).   Because the Sixth Circuit has held the contrary, the Circuits are divided about the proper interpretation of the provision.   We granted certiorari to resolve this conflict.

## II

Petitioners received the punitive damages at issue here "by suit"—indeed "by" an ordinary "suit" for "personal injuries."   Contrast *United States* v. *Burke*, 504 U. S. 229 (1992) (§ 104(a)(2) exclusion not applicable to backpay awarded under Title VII of the Civil Rights Act of 1964 because the claim was not based upon " 'tort or tort type rights,' " *id.*, at 233); *Commissioner* v. *Schleier*, 515 U. S. 323 (1995) (alternative holding) (Age Discrimination in Employment Act of 1967 (ADEA) claim is similar to Title VII claim in *Burke* in this respect).   These legal circumstances bring those damages within the gross-income-exclusion provision, however, only if petitioners also "received" those damages "*on account of*" the "personal injuries."   And the phrase "on account of" does not unambiguously define itself.

On one linguistic interpretation of those words, that of petitioners, they require no more than a "but-for" connection between "any" damages and a lawsuit for personal injuries. They would thereby bring virtually all personal injury lawsuit damages within the scope of the provision, since: "but for the personal injury, there would be no lawsuit, and but for the lawsuit, there would be no damages."

On the Government's alternative interpretation, however, those words impose a stronger causal connection, making the provision applicable only to those personal injury lawsuit damages that were awarded by reason of, or because of, the personal injuries. To put the matter more specifically, they would make the section inapplicable to punitive damages, where those damages

> "'are not compensation for injury [but] [i]nstead . . . are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence.'" *Electrical Workers* v. *Foust*, 442 U. S. 42, 48 (1979), quoting *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 350 (1974) (footnote omitted).

The Government says that such damages were not "received . . . on account of" the personal injuries, but rather were awarded "on account of" a defendant's reprehensible conduct and the jury's need to punish and to deter it. Hence, despite some historical uncertainty about the matter, see Rev. Rul. 75–45, 1975–1 Cum. Bull. 47, revoked by Rev. Rul. 84–108, 1984–2 Cum. Bull. 32, the Government now concludes that these punitive damages fall outside the statute's coverage.

We agree with the Government's interpretation of the statute. For one thing, its interpretation gives the phrase "on account of" a meaning consistent with the dictionary definition. See, *e. g.*, Webster's Third New International Dictionary 13 (1981) ("for the sake of: by reason of: because of").

More important, in *Schleier, supra*, we came close to resolving the statute's ambiguity in the Government's favor. That case did not involve damages received in an ordinary tort suit; it involved liquidated damages and backpay received in a settlement of a lawsuit charging a violation of the ADEA. Nonetheless, in deciding one of the issues there presented (whether the provision now before us covered ADEA liquidated damages), we contrasted the elements of

an ordinary tort recovery with ADEA liquidated damages. We said that pain and suffering damages, medical expenses, and lost wages in an ordinary tort case are covered by the statute and hence excluded from income

> "not simply because the taxpayer received a tort settlement, but rather because each element . . . satisfies the requirement . . . that the damages were received 'on account of personal injuries or sickness.'" *Id.*, at 330.

In holding that ADEA liquidated damages are not covered, we said that they are not "designed to compensate ADEA victims," *id.*, at 332, n. 5; instead, they are "'punitive in nature,'" *id.*, at 332, quoting *Trans World Airlines, Inc.* v. *Thurston*, 469 U. S. 111, 125 (1985).

Applying the same reasoning here would lead to the conclusion that the punitive damages are not covered because they are an element of damages not "designed to compensate . . . victims," *Schleier*, 515 U. S., at 332; rather they are "'punitive in nature,'" *ibid.* Although we gave other reasons for our holding in *Schleier* as well, we explicitly labeled this reason an "independent" ground in support of our decision, *id.*, at 334. We cannot accept petitioners' claim that it was simply a dictum.

We also find the Government's reading more faithful to the history of the statutory provision as well as the basic tax-related purpose that the history reveals. That history begins in approximately 1918. At that time, this Court had recently decided several cases based on the principle that a restoration of capital was not income; hence it fell outside the definition of "income" upon which the law imposed a tax. *E. g.*, *Doyle* v. *Mitchell Brothers Co.*, 247 U. S. 179, 187 (1918); *Southern Pacific Co.* v. *Lowe*, 247 U. S. 330, 335 (1918). The Attorney General then advised the Secretary of the Treasury that proceeds of an accident insurance policy should be treated as nontaxable because they primarily

"substitute . . . capital which is the source of *future* periodical income . . . merely tak[ing] the place of capital in human ability which was destroyed by the accident. They are therefore [nontaxable] 'capital' as distinguished from 'income' receipts." 31 Op. Atty. Gen. 304, 308 (1918).

The Treasury Department added that

"upon similar principles . . . an amount received by an individual as the result of a suit or compromise for personal injuries sustained by him through accident is not income [that is] taxable. . . ." T. D. 2747, 20 Treas. Dec. Int. Rev. 457 (1918).

Soon thereafter, Congress enacted the first predecessor of the provision before us. That provision excluded from income

"[a]mounts received, through accident or health insurance or under workmen's compensation acts, as compensation for personal injuries or sickness, plus the amount of any damages received whether by suit or agreement on account of such injuries or sickness." Revenue Act of 1918, ch. 18, § 213(b)(6), 40 Stat. 1066.

The provision is similar to the cited materials from the Attorney General and the Secretary of the Treasury in language and structure, all of which suggests that Congress sought, in enacting the statute, to codify the Treasury's basic approach. A contemporaneous House Report, insofar as relevant, confirms this similarity of approach, for it says:

"Under the present law it is doubtful whether amounts received through accident or health insurance, or under workmen's compensation acts, as compensation for personal injury or sickness, and damages received on account of such injuries or sickness, are required to be included in gross income. The proposed bill provides

that such amounts shall not be included in gross income." H. R. Rep. No. 767, pp. 9–10 (1918).

This history and the approach it reflects suggest there is no strong reason for trying to interpret the statute's language to reach beyond those damages that, making up for a loss, seek to make a victim whole, or, speaking very loosely, "return the victim's personal or financial capital."

We concede that the original provision's language does go beyond what one might expect a purely tax-policy-related "human capital" rationale to justify. That is because the language excludes from taxation not only those damages that aim to substitute for a victim's physical or personal well-being—personal assets that the Government does not tax and would not have taxed had the victim not lost them. It also excludes from taxation those damages that substitute, say, for lost wages, which would have been taxed had the victim earned them. To that extent, the provision can make the compensated taxpayer better off from a tax perspective than had the personal injury not taken place.

But to say this is not to support cutting the statute totally free from its original moorings in victim loss. The statute's failure to separate those compensatory elements of damages (or accident insurance proceeds) one from the other does not change its original focus upon damages that restore a loss, that seek to make a victim whole, with a tax-equality objective providing an important part of, even if not the entirety of, the statute's rationale. All this is to say that the Government's interpretation of the current provision (the wording of which has not changed significantly from the original) is more consistent than is petitioners' with the statute's original focus.

Finally, we have asked *why* Congress might have wanted the exclusion to have covered these punitive damages, and we have found no very good answer. Those damages are not a substitute for any normally untaxed personal (or financial) quality, good, or "asset." They do not compensate for

any kind of loss. The statute's language does not require, or strongly suggest, their exclusion from income. And we can find no evidence that congressional generosity or concern for administrative convenience stretched beyond the bounds of an interpretation that would distinguish compensatory from noncompensatory damages.

Of course, as we have just said, from the perspective of tax policy one might argue that noncompensatory punitive damages and, for example, compensatory lost wages are much the same thing. That is, in both instances, exclusion from gross income provides the taxpayer with a windfall. This circumstance alone, however, does not argue strongly for an interpretation that covers punitive damages, for coverage of compensatory damages has both language and history in its favor to a degree that coverage of noncompensatory punitive damages does not. Moreover, this policy argument assumes that coverage of lost wages is something of an anomaly; if so, that circumstance would not justify the extension of the anomaly or the creation of another. See Wolfman, Current Issues of Federal Tax Policy, 16 U. Ark. Little Rock L. J. 543, 549–550 (1994) ("[T]o build upon" what is, from a tax policy perspective, the less easily explained portion "of the otherwise rational exemption for personal injury," simply "does not make sense").

Petitioners make three sorts of arguments to the contrary. First, they emphasize certain words or phrases in the original, or current, provision that work in their favor. For example, they stress the word "any" in the phrase "any damages." And they note that in both original and current versions Congress referred to certain amounts of money received (from workmen's compensation, for example) as "amounts received . . . as compensation," while here they refer only to "damages received" without adding the limiting phrase "as compensation." 26 U. S. C. § 104(a); Revenue Act of 1918, § 213(b)(6), 40 Stat. 1066. They add that in the original version, the words "on account of personal injuries"

might have referred to, and modified, the kind of lawsuit, not the kind of damages. And they find support for this view in the second sentence of the Treasury Regulation first adopted in 1958 which says:

> "The term 'damages received (whether by suit or agreement)' means an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." 26 CFR § 1.104–1(c) (1996).

These arguments, however, show only that one can reasonably read the statute's language in different ways—the very assumption upon which our analysis rests. They do not overcome our interpretation of the provision in *Schleier,* nor do they change the provision's history. The help that the Treasury Regulation's second sentence gives the petitioners is offset by its *first* sentence, which says that the exclusion applies to damages received "on account of personal injuries or sickness," and which we have held sets forth an independent requirement. *Schleier,* 515 U. S., at 336. See Appendix, *infra,* at 92.

Second, petitioners argue that to some extent the purposes that might have led Congress to exclude, say, lost wages from income would also have led Congress to exclude punitive damages, for doing so is both generous to victims and avoids such administrative problems as separating punitive from compensatory portions of a global settlement or determining the extent to which a punitive damages award is itself intended to compensate.

Our problem with these arguments is one of degree. Tax generosity presumably has its limits. The administrative problem of distinguishing punitive from compensatory elements is likely to be less serious than, say, distinguishing among the compensatory elements of a settlement (which difficulty might account for the statute's treatment of, say, lost

wages). And, of course, the problem of identifying the elements of an ostensibly punitive award does not exist where, as here, relevant state law makes clear that the damages at issue are not at all compensatory, but entirely punitive. *Brewer* v. *Home-Stake Production Co.*, 200 Kan. 96, 100, 434 P. 2d 828, 831 (1967) ("[E]xemplary damages are not regarded as compensatory in any degree"); accord, *Smith* v. *Printup*, 254 Kan. 315, 866 P. 2d 985 (1993); *Folks* v. *Kansas Power & Light Co.*, 243 Kan. 57, 755 P. 2d 1319 (1988); *Nordstrom* v. *Miller*, 227 Kan. 59, 605 P. 2d 545 (1980).

Third, petitioners rely upon a later enacted law. In 1989, Congress amended the law so that it now specifically says the personal injury exclusion from gross income

> "shall not apply to any punitive damages in connection with a case not involving physical injury or physical sickness." 26 U. S. C. § 104(a).

Why, petitioners ask, would Congress have enacted this amendment removing punitive damages (in nonphysical injury cases) unless Congress believed that, in the amendment's absence, punitive damages did fall within the provision's coverage?

The short answer to this question is that Congress might simply have thought that the then-current law about the provision's treatment of punitive damages—in cases of physical and nonphysical injuries—was unclear, that it wanted to clarify the matter in respect to nonphysical injuries, but it wanted to leave the law where it found it in respect to physical injuries. The fact that the law was indeed uncertain at the time supports this view. Compare Rev. Rul. 84–108, 1984–2 Cum. Bull. 32, with, *e. g., Roemer* v. *Commissioner*, 716 F. 2d 693 (CA9 1983); *Miller* v. *Commissioner*, 93 T. C. 330 (1989), rev'd 914 F. 2d 586 (CA4 1990).

The 1989 amendment's legislative history, insofar as relevant, offers further support. The amendment grew out of the Senate's refusal to agree to a House bill that would have

made *all* damages in nonphysical personal injury cases taxable. The Senate was willing to specify only that the Government could tax punitive damages in such cases. Compare H. R. Rep. No. 101–247, p. 1355 (1989), with H. R. Conf. Rep. No. 101–386, pp. 622–623 (1989). Congress' primary focus, in other words, was upon what to do about nonphysical personal injuries, not upon the provision's coverage of punitive damages under pre-existing law.

We add that, in any event, the view of a later Congress cannot control the interpretation of an earlier enacted statute. *United States* v. *Price,* 361 U. S. 304 (1960); *Higgins* v. *Smith,* 308 U. S. 473 (1940). But cf. *Burke,* 504 U. S., at 235, n. 6 (including a passing reference to the 1989 amendment, in dicta, as support for a view somewhat like that of petitioners).

(Although neither party has argued that it is relevant, we note in passing that § 1605 of the Small Business Job Protection Act of 1996, Pub. L. 104–188, 110 Stat. 1838, explicitly excepts most punitive damages from the exclusion provided by § 104(a)(2). Because it is of prospective application, the section does not apply here. The Conference Report on the new law says that "[n]o inference is intended" as to the proper interpretation of § 104(a)(2) prior to amendment. H. R. Conf. Rep. No. 104–737, p. 301 (1996).)

The upshot is that we do not find petitioners' arguments sufficiently persuasive. And, for the reasons set out *supra,* at 83–87, we agree with the Government's interpretation of the statute.

## III

Petitioners have raised two further issues, specific to the procedural posture of this litigation. First, the O'Gilvie children point out that the Government had initially accepted their claim for a refund and wrote those checks on July 6, 1990. The Government later changed its mind and, on July 9, 1992, two years plus three days later, filed suit against them seeking the return of a refund erroneously made. 26 U. S. C. § 7405(b) (authorizing a "civil action brought in the

name of the United States" to recover any "portion of a tax
. . . which has been erroneously refunded"). They add that
the relevant statute of limitations specifies that recovery of
the refund "shall be allowed only if such suit is begun within
2 years after the making of such refund." § 6532(b).

The children concede that they *received* the refund checks
on July 9, 1990, and they agree that if the limitation period
runs from the date of receipt—if, as the Government argues,
that is the date of the "making of" the refund—the Govern-
ment's suit was timely. But the children say that the refund
was made on, and the limitations period runs from, the date
the Government *mailed* the checks (presumably July 6, 7, or
8), in which case the Government brought this suit one or
two or three days too late.

In our view, the Government is correct in its claim that its
lawsuit was timely. The language of the statute admits of
both interpretations. But the law ordinarily provides that
an action to recover mistaken payments of money "accrues
upon the receipt of payment," *New Bedford* v. *Lloyd Invest-
ment Associates, Inc.*, 363 Mass. 112, 119, 292 N. E. 2d 688,
692 (1973); accord, *Sizemore* v. *E. T. Barwick Industries,
Inc.*, 225 Tenn. 226, 233, 465 S. W. 2d 873, 876 (1971) (" '[T]he
time of making the . . . payment . . . was the date of actual
receipt' "), unless, as in some States and in some cases, it
accrues upon the still later date of the mistake's discovery,
see Allen & Lamkin, When Statute of Limitations Begins to
Run Against Action to Recover Money Paid By Mistake, 79
A. L. R. 3d 754, 766–769 (1977). We are not aware of any
good reason why Congress would have intended a different
result where the nature of the claim is so similar to a tradi-
tional action for money paid by mistake—an action the roots
of which can be found in the old common-law claim of
"assumpsit" or "money had and received." *New Bedford,
supra*, at 118, 292 N. E. 2d, at 691–692. The lower courts
and commentators have reached a similar conclusion.
*United States* v. *Carter*, 906 F. 2d 1375 (CA9 1990); *Akers* v.
*United States*, 541 F. Supp. 65, 67 (MD Tenn. 1981); *United*

*States* v. *Woodmansee*, 388 F. Supp. 36, 46 (ND Cal. 1975), rev'd on other grounds, 578 F. 2d 1302 (CA9 1978); 14 J. Mertens Law of Federal Income Taxation § 54A.69 (1995); Kafka & Cavanagh, Litigation of Federal Civil Tax Controversies § 20.03, p. 20–15 (2d ed. 1995). That conclusion is consistent with dicta in an earlier case from this Court, *United States* v. *Wurts*, 303 U. S. 414, 417–418 (1938), as well as with this Court's normal practice of construing ambiguous statutes of limitations in Government action in the Government's favor. *E. g., Badaracco* v. *Commissioner*, 464 U. S. 386, 391 (1984).

We concede the children's argument that a "date of mailing" interpretation produces marginally greater certainty, for such a rule normally would refer the court to the postmark to establish the date. But there is no indication that a "date of receipt" rule has proved difficult to administer in ordinary state or common-law actions for money paid erroneously. The date the check clears, after all, sets an outer bound.

Second, Kelly O'Gilvie says that the Court of Appeals should not have considered the Government's original appeal from the District Court's judgment in his favor because, in his view, the Government filed its notice of appeal a few days too late. The Court of Appeals describes the circumstances underlying this case-specific issue in its opinion. We agree with its determination of the matter for the reasons it has there set forth.

The judgment of the Court of Appeals is

*Affirmed.*

### APPENDIX TO OPINION OF THE COURT

Section 104(a), in 1988, read as follows:

"Compensation for injuries or sickness

"(a) In general.—Except in the case of amounts attributable to (and not in excess of) deductions allowed under

section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include—

"(1) amounts received under workmen's compensation acts as compensation for personal injuries or sickness;

"(2) the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness;

"(3) amounts received through accident or health insurance for personal injuries or sickness (other than amounts received by an employee, to the extent such amounts (A) are attributable to contributions by the employer which were not includible in the gross income of the employee, or (B) are paid by the employer);

"(4) amounts received as a pension, annuity, or similar allowance for personal injuries or sickness resulting from active service in the armed forces of any country or in the Coast and Geodetic Survey or the Public Health Service, or as a disability annuity payable under the provisions of section 808 of the Foreign Service Act of 1980; and

"(5) amounts received by an individual as disability income attributable to injuries incurred as a direct result of a violent attack which the Secretary of State determines to be a terrorist attack and which occurred while such individual was an employee of the United States engaged in the performance of his official duties outside the United States." 26 U. S. C. § 104 (1988 ed.).

In 1989, § 104(a) was amended, adding, among other things, the following language:

"Paragraph (2) shall not apply to any punitive damages in connection with a case not involving physical injury or physical sickness." 26 U. S. C. § 104(a).

Treasury Regulation § 1.104–1(c) provides:

> "Section 104(a)(2) excludes from gross income the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness. The term 'damages received (whether by suit or agreement)' means an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." 26 CFR § 1.104–1(c) (1996).

JUSTICE SCALIA, with whom JUSTICE O'CONNOR and JUSTICE THOMAS join, dissenting.

Section 104(a)(2), as it stood at the time relevant to these cases, provided an exclusion from income for "any damages received . . . on account of personal injuries or sickness." 26 U. S. C. § 104(a)(2) (1988 ed.). The Court is of the view that this phrase, in isolation, is just as susceptible of a meaning that includes only compensatory damages as it is of a broader meaning that includes punitive damages as well. *Ante*, at 82–83. I do not agree. The Court greatly understates the connection between an award of punitive damages and the personal injury complained of, describing it as nothing more than "but-for" causality, *ante*, at 82. It seems to me that the personal injury is as proximate a cause of the punitive damages as it is of the compensatory damages; in both cases it is the *reason* the damages are awarded. That is *why* punitive damages are called *damages*. To be sure, punitive damages require intentional, blameworthy conduct, which can be said to be a coequal reason they are awarded. But negligent (or intentional) conduct occupies the same role of coequal causality with regard to compensatory damages. Both types of damages are "received on account of" the personal injury.

The nub of the matter, it seems to me, is this: If one were to be asked, by a lawyer from another legal system, "What damages can be received on account of personal injuries in

the United States?" surely the correct answer would be "Compensatory damages and punitive damages—the former to compensate for the inflicting of the personal injuries, and the latter to punish for the inflicting of them." If, as the Court asserts, the phrase "damages received on account of personal injuries" *can* be used to refer only to the former category, that is only because people sometimes *can* be imprecise. The notion that Congress carefully and precisely used the phrase "damages received on account of personal injuries" to segregate out *compensatory* damages seems to me entirely fanciful. That is neither the exact nor the ordinary meaning of the phrase, and hence not the one that the statute should be understood to intend.

What I think to be the fair meaning of the phrase in isolation becomes even clearer when the phrase is considered in its statutory context. The Court proceeds too quickly from its erroneous premise of ambiguity to analysis of the history and policy behind § 104(a)(2). *Ante,* at 84–87. Ambiguity in isolation, even if it existed, would not end the textual inquiry. Statutory construction, we have said, is a "holistic endeavor." *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.,* 484 U. S. 365, 371 (1988). "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." *Ibid.*

Section 104(a)(2) appears immediately after another provision, § 104(a)(1), which parallels § 104(a)(2) in several respects but does not use the critical phrase "on account of":

"(a) [G]ross income does not include—

"(1) amounts received under workmen's compensation acts *as compensation for* personal injuries or sickness;

"(2) the amount of any damages received . . . *on account of* personal injuries or sickness." (Emphasis added.)

Although § 104(a)(1) excludes amounts received "as compensation for" personal injuries or sickness, while § 104(a)(2) excludes amounts received "on account of" personal injuries or

sickness, the Court reads the two phrases to mean precisely the same thing. That is not sound textual interpretation. "[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." 2A N. Singer, Sutherland on Statutory Construction § 46.07 (5th ed. 1992 and Supp. 1996). See, *e. g.*, *Russello* v. *United States*, 464 U. S. 16, 23 (1983). This principle of construction has its limits, of course: Use of different terminology in differing contexts might have little significance. But here the contrasting phrases appear in adjoining provisions that address precisely the same subject matter and that even have identical grammatical structure.

The contrast between the two usages is even more striking in the original statute that enacted them. The Revenue Act of 1918 combined subsections (a)(1) and (a)(2) of § 104, together with (a)(3) (which provides an exclusion from income for amounts received through accident or health insurance for personal injuries or sickness), into a single subsection, which provided:

> "'Gross income' . . . [d]oes not include . . . :
>
> "(6) Amounts received, through accident or health insurance or under workmen's compensation acts, *as compensation for* personal injuries or sickness, plus the amount of any damages received . . . *on account of* such injuries or sickness." § 213(b)(6) of the Revenue Act of 1918, 40 Stat. 1065–1066 (emphasis added).

The contrast between the first exclusion and the second could not be more clear. Had Congress intended the latter provision to cover only damages received "as compensation for" personal injuries or sickness, it could have written "amounts received, through accident or health insurance, under workmen's compensation acts, or in damages, as compensation for personal injuries or sickness." Instead, it tacked on an additional phrase "plus the amount of[, etc.]"

with no apparent purpose except to make clear that not *only* compensatory damages were covered by the exclusion.

The Court maintains, however, that the Government's reading of § 104(a)(2) is "more faithful to [its] history." *Ante*, at 84. The "history" to which the Court refers is not statutory history of the sort just discussed—prior enactments approved by earlier Congresses and revised or amended by later ones to produce the current text. Indeed, it is not "history" from within even a small portion of Congress, since the House Committee Report the Court cites, standing by itself, is uninformative, saying only that "[u]nder the present law it is doubtful whether . . . damages received on account of [personal] injuries or sickness are required to be included in gross income." H. R. Rep. No. 767, 65th Cong., 2d Sess., 9–10 (1918). The Court makes this snippet of legislative history relevant by citing as pertinent an antecedent Treasury Department decision, which concludes on the basis of recent judicial decisions that amounts received from prosecution or compromise of a personal-injury suit are not taxable *because they are a return of capital*. *Ante*, at 85 (citing T. D. 2747, 20 Treas. Dec. Int. Rev. 457 (1918)).

One might expect the Court to conclude from this that the Members of Congress (on the unrealistic assumption that they knew about the Executive Branch opinion) meant the statutory language to cover only return of capital, the source of the "doubt" to which the Committee Report referred. But of course the Court cannot draw that logical conclusion, since even if it is applied only to compensatory damages the statute obviously and undeniably covers *more* than mere return of "human capital," namely, reimbursement for lost income, which would be a large proportion (indeed perhaps the majority) of any damages award. The Court concedes this is so, but asserts that this inconsistency is not enough "to support cutting the statute totally free from its original moorings," *ante*, at 86, by which I assume it means the Treasury Decision, however erroneous it might have been as

to the "capital" nature of compensatory damages. But the Treasury Decision was no more explicitly limited to compensatory damages than is the statute before us. It exempted from taxation "an amount received by an individual as the result of a suit or compromise for personal injuries." T. D. 2747, *supra,* at 457. The Court's entire thesis of taxability rests upon the proposition that this Treasury Decision, which overlooked the obvious fact that "an amount received . . . as the result of a suit or compromise for personal injuries" almost always includes compensation for lost future income, did *not* overlook the obvious fact that such an amount sometimes includes "smart money."

So, to trace the Court's reasoning: The statute must exclude punitive damages because the Committee Report must have had in mind a 1918 Treasury Decision, whose text no more supports exclusion of punitive damages than does the text of the statute itself, but which must have *meant* to exclude punitive damages since it was based on the "return-of-capital" theory, though, inconsistently with that theory, it did *not* exclude the much more common category of compensation for lost income. Congress supposedly knew all of this, and a reasonably diligent lawyer could figure it out by mistrusting the inclusive language of the statute, consulting the Committee Report, surmising that the Treasury Decision of 1918 underlay that Report, mistrusting the inclusive language of the Treasury Decision, and discerning that Treasury *could* have overlooked lost-income compensatories, but could *not* have overlooked punitives. I think not. The sure and proper guide, it seems to me, is the language of the statute, inclusive by nature and doubly inclusive by contrast with surrounding provisions.

The Court poses the question, *ante,* at 86, "*why* Congress might have wanted the exclusion [in § 104(a)(2)] to have covered . . . punitive damages." If an answer is needed (and the text being as clear as it is, I think it is not), surely it suffices to surmise that Congress was following the Treasury

Decision, which had inadvertently embraced punitive damages just as it had inadvertently embraced future-income compensatory damages.  Or if some reason free of human error must be found, I see nothing wrong with what the Court itself suggests but rejects out of hand: Excluding punitive as well as compensatory damages from gross income "avoids such administrative problems as separating punitive from compensatory portions of a global settlement."  *Ante*, at 88.  How substantial that particular problem is is suggested by the statistics which show that 73 percent of tort cases in state court are disposed of by settlement, and between 92 and 99 percent of tort cases in federal court are disposed of by either settlement or some other means (such as summary judgment) prior to trial.  See B. Ostrom & N. Kauder, Examining the Work of State Courts, 1994, p. 34 (1996); Administrative Office of the United States Courts, L. Mecham, Judicial Business of the United States Courts: 1995 Report of the Director 162–164.  What is at issue, of course, is not just imposing on the parties the necessity of allocating the settlement between compensatory and punitive damages (with the concomitant suggestion of intentional wrongdoing that *any* allocation to punitive damages entails), but also imposing on the Internal Revenue Service the necessity of reviewing that allocation, since there would always be strong incentive to inflate the tax-free compensatory portion.  The Court's only response to the suggestion that this is an adequate reason (if one is required) for including punitive damages in the exemption is that "[t]he administrative problem of distinguishing punitive from compensatory elements is likely to be less serious than, say, distinguishing among the compensatory elements of a settlement."  *Ante*, at 88.  Perhaps so; and it may also be more simple than splitting the atom; but that in no way refutes the point that it is complicated *enough* to explain the inclusion of punitive damages in an exemption that has already abandoned the purity of a "return-of-capital" rationale.

The remaining argument offered by the Court is that our decision in *Commissioner* v. *Schleier*, 515 U. S. 323 (1995), came "close to resolving"—in the Government's favor—the question whether § 104(a)(2) permits the exclusion of punitive damages. *Ante*, at 83. I disagree. In *Schleier* we were faced with the question whether backpay and liquidated damages under the Age Discrimination in Employment Act of 1967 (ADEA) were "damages received . . . on account of personal injuries or sickness" for purposes of § 104(a)(2)'s exclusion. As the dissent accurately observed, 515 U. S., at 342 (opinion of O'CONNOR, J.), "the key to the Court's analysis" was the determination that an ADEA cause of action did not necessarily entail "personal injury or sickness," so that the damages awarded for that cause of action could hardly be awarded "on account of personal injuries or sickness." See *id.*, at 330. In the case at hand, we said, "respondent's unlawful termination may have caused some psychological or 'personal' injury comparable to the intangible pain and suffering caused by an automobile accident," but "it is clear that no part of respondent's recovery of back wages is attributable to that injury." *Ibid.* The respondent countered that at least "the liquidated damages portion of his settlement" could be linked to that psychological injury. *Id.*, at 331. And it was in response to *that* argument that we made the statement which the Court seeks to press into service for today's opinion. ADEA liquidated damages, we said, were punitive in nature, rather than compensatory. *Id.*, at 331–332, and n. 5.

The Court recites this statement as though the point of it was that punitive damages could not be received "on account of" personal injuries, whereas in fact the point was quite different: Since the damages were punishment for the conduct that gave rise to the (non-personal-injury) cause of action, they could not be "linked to" the incidental psychological injury. In the present cases, of course, there is no question that a personal injury occurred and that this per-

sonal injury is what entitled petitioners to compensatory and punitive damages. We neither decided nor intimated in *Schleier* whether punitive damages that are indisputably "linked to" personal injuries or sickness are received "on account of" such injuries or sickness. Indeed, it would have been odd for us to resolve that question (or even come "close to resolving" it) without any discussion of the numerous considerations of text, history, and policy highlighted by today's opinion. If one were to search our opinions for a dictum bearing upon the present issue, much closer is the statement in *United States* v. *Burke*, 504 U. S. 229 (1992), that a statute confers "tort or tort type rights" (qualifying a plaintiff's recovery for the § 104(a)(2) exemption) if it entitles the plaintiff to "a jury trial at which 'both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages' may be awarded." *Id.*, at 240 (quoting *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454, 460 (1975)).

But all of this is really by the way. Because the statutory text unambiguously covers punitive damages that are awarded on account of personal injuries, I conclude that petitioners were entitled to deduct the amounts at issue here. This makes it unnecessary for me to reach the question, discussed *ante*, at 90–92, whether the Government's refund action against the O'Gilvie children was commenced within the 2-year period specified by 26 U. S. C. § 6532(b). I note, however, that the Court's resolution of these cases also does not demand that this issue be addressed, except to the extent of rejecting the proposition that the statutory period begins to run with the mailing of a refund check. So long as that is not the trigger, there is no need to decide whether the proper trigger is receipt of the check or some later event, such as the check's clearance.

For the reasons stated, I respectfully dissent from the judgment of the Court.