T.C. Memo. 1999-205


UNITED STATES TAX COURT


FRED HENRY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 26254-96.                    Filed June 21, 1999.


<u>Robert G. Gargiulo</u>, for petitioner.

<u>Stephen R. Takeuchi</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


CHIECHI, <u>Judge</u>:  Respondent determined deficiencies in,

additions under section 6651(a)(1)[1] to, and an accuracy-related

---

[1]All section references are to the Internal Revenue Code
(Code) in effect for the years at issue.  All Rule references are
to the Tax Court Rules of Practice and Procedure.

penalty under section 6662(a) on petitioner's Federal income tax (tax), as follows:

| Year | Deficiency | Additions to Tax | Accuracy-Related Penalty |
|------|-----------|------------------|--------------------------|
| 1992 | $47,092 | $11,773 | -- |
| 1994 | 664,931 | 33,247 | $132,986 |

The issues for decision are:

(1)  Is the $150,000 payment that petitioner received from E.I. du Pont de Nemours & Company, Inc. (du Pont) in 1992 includible in his income for that year?  We hold that it is to the extent stated herein.

(2)  Are the payments totaling $1,623,203 that petitioner received from du Pont in 1994 excludible from his income for that year under section 104(a)(2)?  We hold that they are not.

(3)  Is petitioner liable under section 6651(a)(1) for 1992 for his failure to file a tax return for that year and for 1994 for his failure to file timely his 1994 return?  We hold that he is not so liable for 1992 and that he is so liable for 1994.

(4)  Is petitioner liable under section 6662(a) for 1994 for the accuracy-related penalty?  We hold that he is.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

General Background

Petitioner Fred Henry (petitioner or Mr. Henry) resided in Palmetto, Florida, at the time the petition was filed.

At various times during the late 1960's and the early 1970's, Mr. Henry owned and operated two gasoline service stations and three pizzerias with respect to which he maintained the books and records.

Mr. Henry's Orchid Activity

Mr. Henry first became interested in orchids around the late 1960's. Since that time, Mr. Henry, who has had no formal training in horticulture, has spent approximately 28 years developing unique and high quality orchids, first as a hobby and then as a business and a hobby.

In 1978, Mr. Henry purchased certain real property in Manatee County, Florida. Mr. Henry, with the assistance of his former wife Donna Henry, a.k.a. Donna Estes (Ms. Estes), developed that property into an orchid nursery. Mr. Henry, assisted by Ms. Estes, operated that orchid nursery under the name Fred Henry's Paradise of Orchids. (We shall sometimes refer to the orchid activity of Mr. Henry and Ms. Estes as Mr. Henry's orchid activity or Fred Henry's Paradise of Orchids.) By at least the late 1980's, Mr. Henry had established that he had the ability to grow high quality orchids and to overcome the many problems associated with growing orchids.

At all relevant times, Mr. Henry maintained the books and records of Fred Henry's Paradise of Orchids and understood that money received from the sale of orchid plants is taxable income. Mr. Henry and Ms. Estes retained a tax return preparer (return preparer) to whom they gave yearend information for use in preparation of their tax returns. Mr. Henry and Ms. Estes used the accrual method of accounting in reporting the income and the expenses relating to Mr. Henry's orchid activity and reported that income and those expenses in Schedules C of their tax returns (Schedules C). All orchid plants in that activity were included in the Schedules C as inventory. Costs associated with the purchase and raising of those plants were either included in inventory costs or expensed in the Schedules C.

At all relevant times, Fred Henry's Paradise of Orchids was a wholesale, and not a retail, operation, although it occasionally sold orchid plants at retail to members of orchid societies and certain others who desired to purchase high quality orchids. During 1991, many of the plants of Fred Henry's Paradise of Orchids were sold to Selby Botanical Gardens (Selby), an important botanical garden and world renowned orchid center whose customers generally were interested in very high quality plants. The other principal wholesale customers of Mr. Henry's orchid activity during 1991 were Sagaert's Orchids in Lake Worth, Florida, and Log Cabin Garden Center in St. Petersburg, Florida.

For a certain period prior to October 1991, Mr. Henry exhibited certain of his orchid plants at flower shows and special events, made presentations to orchid societies and others interested in growing orchids, and permitted orchid societies to visit his nursery. The American Orchid Society awarded prizes to Fred Henry's Paradise of Orchids for the quality of certain of its orchid plants.

Orchid plants take five to nine years to reach maturity, and certain types of orchid plants may have a very long life expectancy. Orchid plants are salable only when they are in flower. The age, size, quality, and flowering capacity of the orchid plant and the reputation of the orchid grower are factors in determining the value of such a plant. A large orchid plant of high quality with excellent flowering capacity increases in value as it becomes older.

During the period 1987 through around September 1991, Mr. Henry purchased and used a chemical fungicide manufactured by du Pont, which was marketed under the name Benlate DF (Benlate). Mr. Henry applied Benlate to all orchid plants in his possession in order to prevent the growth of, or to eradicate, fungus which was harmful to those plants. In addition to the orchid plants owned by Fred Henry's Paradise of Orchids, Mr. Henry had in his possession orchid plants owned by third parties. A large portion of the orchid plants in Mr. Henry's possession were not for sale

but were used to propagate orchid plants for future sales or to develop further unique orchids. Certain other orchid plants in Mr. Henry's possession were immature and not ready for sale.

Sometime during 1990, Mr. Henry noticed diminishing flower production in at least some of the orchid plants in his possession. During 1991, Selby and certain others who had purchased orchid plants from Mr. Henry that became defective returned those plants to Mr. Henry and/or made complaints about them. Customers of Fred Henry's Paradise of Orchids were not interested in purchasing orchid plants that had Benlate problems. By October 1991, petitioner had sold plants which had been treated with Benlate before they showed signs of deformity and which eventually developed deformity. All of the orchid plants in Mr. Henry's possession became deformed, unmarketable, and useless as unique plants as a result of his having applied Benlate to them, and many of them died.

During 1991, du Pont realized that its fungicide Benlate may be responsible for damaged plants, established a Benlate claims process, and retained Crawford & Company (Crawford) as its representative to work in the field to assist it in evaluating alleged damage caused by Benlate and processing claims for such damage. During that year, Mr. Henry began negotiating with du Pont concerning the damage to the orchid plants of Fred Henry's Paradise of Orchids and other orchid plants in his possession,

which was allegedly caused by Benlate. Around September or October 1991, a representative of du Pont inspected the orchid plants in Mr. Henry's possession and informed him that those plants had been damaged by Benlate. Mr. Henry decided to, and did, cease making business sales of orchid plants by Fred Henry's Paradise of Orchids in October 1991, at which time he had between 100 and 150 orchid plants that were in salable condition. After Mr. Henry decided to stop making orchid business sales in October 1991, he did not receive requests to sell orchid plants, to exhibit them, or to make presentations to orchid societies and other similar groups.

Beginning in 1991 and continuing into 1992, du Pont made payments that it referred to as assistance payments (assistance payments) to persons who filed claims (claimants) with du Pont for alleged damage caused by Benlate. The intention of du Pont in making the assistance payments was to assist the claimants to pay bills and other expenses that they had difficulty in paying as a result of the alleged damage to their businesses caused by Benlate, to help reestablish their businesses, to mitigate losses, and for goodwill. Du Pont made an assistance payment to a claimant only after having received a claim from that claimant and having it evaluated by Crawford, its claims adjustor. It was du Pont's rule of thumb to limit an assistance payment to one-third of the amount of any anticipated settlement between it and

a claimant of that claimant's claim for damage. Where a claimant recovered from du Pont, it was expected that the assistance payment that it had made to that claimant was to be deducted as having been paid from any ultimate settlement or judgment.

Du Pont never required a claimant to repay an assistance payment that it made to such claimant. Du Pont's Benlate resolution manager who was in charge of assistance payments and certain other du Pont officials considered that du Pont had a right to ask that an assistance payment be paid back to it. The return of an assistance payment to du Pont was discussed by du Pont officials, but they never sought a formal opinion from du Pont's attorneys on the question.

Du Pont requested an opinion from its tax counsel as to whether it was required to issue a Form 1099 to each claimant who received an assistance payment and whether it could issue a Form 1099 to such a claimant. The response of du Pont's tax counsel to each of those questions was no. Du Pont never issued a Form 1099 for the assistance payments that it made.

By letter dated November 20, 1991, Mr. Henry requested $50,000 from du Pont in order to meet outstanding obligations. That letter stated in pertinent part:

> Having closed my business on October 7th, 1991, I have had no income. Now it is time to arrange for the proper disposal of the damaged plant material. In order to restock my greenhouses, it is necessary to go to Hawaii and Thailand to personally inspect any plants

I am interested in purchasing to assure they are not damaged.  Currently we need $50,000.00 to meet out-standing obligations.

By letter dated December 27, 1991, Crawford sent Mr. Henry a check dated December 26, 1991, in the amount of $50,000 ($50,000 assistance payment), which was issued by du Pont to Fred Henry's Paradise of Orchids.  That letter stated in pertinent part:

Enclosed is your advance assistance check that you requested.  Delivery of this check is predicated on our agreement that you will deliver the signed Assistance Receipt via regular mail as soon as possible to the mailing address below.

Our investigation of your claim is still ongoing and I will keep you advised on the progress of our evalua-tion. * * *

On December 27, 1991, Mr. Henry signed the assistance receipt (assistance receipt) for the $50,000 assistance payment. That assistance receipt stated in pertinent part:

This will acknowledge that the undersigned has * * * received Fifty Thousand and 00/100 Dollars ($50,000.00) from E. I. DuPont De Nemours & Company, Inc.  This payment represents assistance that I * * * requested while E. I. DuPont De Nemours & Company evaluates my * * * claim pertaining to:

Orchids
_____
(DESCRIBE HERE THE CROP ON WHICH OUR PRODUCT WAS USED, E.G., "ALL ORNAMENTAL BEDDING PLANTS, SHRUBS, TREES, AG CROPS, ETC., OWNED BY OR UNDER PRODUCTION BY THE UN-DERSIGNED OR SAID FIRM TREATED WITH BENLATE 50 DF IN 1990 AND 1991).

I * * * understand and agree that the full amount of this payment will be applied to the amount of a negotiated settlement, if any, or to any final judge-ment that may be entered with respect to my * * * claims.

I * * * UNDERSTAND AND AGREE THAT THIS IS NEITHER A RELEASE ON MY * * * CLAIM NOR AN ACKNOWLEDGEMENT OF LIABILITY BY E. I. DUPONT DE NEMOURS & COMPANY, INC.

On January 13, 1992, Mr. Henry and Ms. Estes entered into a partial settlement agreement relating to their contemplated divorce. That agreement provided in pertinent part:

8. Proceeds for Settlement and/or Payment from E.I. DuPont De Nemours & Company, Inc. Upon execution of this Agreement any monies or proceeds received from E.I. DuPont De Nemours & Company, Inc. made payable to either or both parties [to either Mr. Henry or Ms. Estes or to both of them], or to Fred Henry's Paradise of Orchids, or any other entity associated with the parties shall be split in a 70:30 proportion, with 70% thereof to go to the Husband and 30% to go to the Wife.

On May 8, 1992, Mr. Henry and Ms. Estes entered into a marital settlement agreement relating to their contemplated divorce. That agreement provided in pertinent part:

3. PROCEEDS FROM DUPONT. The parties are currently negotiating with E.I. DuPont DeNemours & Company, Inc. (hereinafter referred to as "DuPont"), regarding damages sustained from a chemical produced by DuPont. It is specifically agreed that any monies or any other proceeds made payable to either or both parties, or to Fred Henry's Paradise of Orchids, or to Henry and Estes Associates, or any other entity associated with the parties, shall be split in a 70:30 proportion, with 70% thereof to go to the Husband [Mr. Henry] and 30% to go to the Wife [Ms. Estes]. * * *

By letter dated January 21, 1992, Mr. Henry requested an additional assistance payment of $150,000 from du Pont. That letter stated in pertinent part:

Thank you very much for the assistance check dated 12-26-91 in the amount of $50,000.00. It certainly helped to ease the debt situation I suffer. Now I

request an additional assistance check for $150,000.00.
In order to:  1) Pay off the remainder of my debts.
2) To live up to my obligation as required by Florida
state law to buy back damaged and dead plants from my
customers.  3) To put deposits on various groups of
plants from Thailand and Hawaii so that I will have
plants available to me when the final settlement occurs
and I can get back into business without further delay.
* * *

By letter dated February 4, 1992, Crawford sent Mr. Henry a
check dated February 2, 1992, in the amount of $150,000 ($150,000
assistance payment), which was issued by du Pont to Fred Henry's
Paradise of Orchids.  That letter stated in pertinent part:

Enclosed is your advance assistance check that you
requested.  Delivery of this check is predicated on our
agreement that you will deliver the signed Assistance
Receipt via regular mail as soon as possible to the
mailing address below.

Our investigation of your claim is still ongoing and I
will keep you advised on the progress of our evalua-
tion. * * *

On February 4, 1992, Mr. Henry signed the assistance receipt
for the $150,000 assistance payment.  That assistance receipt
stated in pertinent part:

This will acknowledge that the undersigned has
* * * received One Hundred Fifty Thousand Dollars
($150,000.00) from E. I. DuPont De Nemours & Company,
Inc.  This payment represents assistance that I * * *
requested while E. I. DuPont De Nemours & Company
evaluates my * * * claim pertaining to:

<u>                          Orchids                          </u>
(DESCRIBE HERE THE CROP ON WHICH OUR PRODUCT WAS USED,
E. G., "ALL ORNAMENTAL BEDDING PLANTS, SHRUBS, TREES,
AG CROPS, ETC., OWNED BY OR UNDER PRODUCTION BY THE
UNDERSIGNED OR SAID FIRM TREATED WITH BENLATE 50 DF IN
1990 AND 1991).

> I * * * understand and agree that the full amount
> of this payment will be applied to the amount of a
> negotiated settlement, if any, or to any final judge-
> ment that may be entered with respect to my * * *
> claims.
>
> I * * * UNDERSTAND AND AGREE THAT THIS IS NEITHER A
> RELEASE ON MY * * * CLAIM NOR AN ACKNOWLEDGEMENT OF
> LIABILITY BY E. I. DUPONT DE NEMOURS & COMPANY, INC.

Neither the $50,000 assistance payment that Mr. Henry received from du Pont in 1991 nor the $150,000 assistance payment that he received from du Pont in 1992 was evidenced by a promissory note. Neither of those assistance payments was contingent upon the pledging of security, and neither of them had any terms of repayment. No interest accrued on the respective assistance payments that du Pont paid Mr. Henry in 1991 and 1992.

When Mr. Henry received the respective assistance payments from du Pont in 1991 and 1992, he was unemployed and was receiving no income. Mr. Henry was never informed that he was required to repay those assistance payments.

At an undisclosed time prior to March 19, 1992, Mr. Henry submitted to Crawford a claim against du Pont as a result of his use of Benlate in the total amount of $2,721,700, which consisted of lost past and future sales, lost inventory, liability to customers pursuant to Florida law, and miscellaneous costs. By letter to Mr. Henry dated March 19, 1992, Crawford proposed on behalf of du Pont a settlement with respect to that claim in the

total amount of $509,742 for projected lost sales and lost inventory.

By letter dated June 16, 1992, Lanny W. Tyler (Mr. Tyler), a certified public accountant retained by Mr. Henry, wrote to Crawford on behalf of Mr. Henry and countered du Pont's proposed settlement of $509,742 with a proposed settlement of $5,143,952, which consisted of $3,264,934 for lost inventory, $231,850 of interest, $168,168 for liability to customers under Florida law, $1,095,000 for lost profits and lost sales, and $384,000 for miscellaneous costs.

By letter dated June 24, 1992, Crawford wrote to Mr. Henry on behalf of du Pont and recommended a settlement of $965,678 with respect to his claim against du Pont. That letter stated in pertinent part:

> Crawford & Company has been attempting to evaluate your claim for economic loss arising from your claimed use of Du Pont's registered fungicide, Benlate DF.
>
> After reviewing the information documentation you have provided to date, our recommended claim settlement is $965,678.00.
>
> We are recommending this amount [$965,678] to conclude any claim that you may have as a result of your claimed use of Du Pont's registered fungicide, Benlate DF.
>
> Our offer will be withdrawn 10 days from the delivery of this letter.

On October 8, 1992, Mr. Henry and Ms. Estes d/b/a Fred Henry's Paradise of Orchids (the plaintiffs) commenced a lawsuit

(lawsuit) against du Pont, Platt Chemical Corporation (Platt), Universal Enterprises Supply Corporation (Universal), and Asgrow Florida Company (Asgrow) by filing a complaint (complaint) in the Circuit Court of the 17th Judicial District in and for Broward County, Florida (Florida Court). Counts I and III of the complaint alleged negligence by du Pont and Platt, respectively. Counts II, IV, V, and VII of the complaint alleged strict liability in tort of du Pont, Platt, Universal, and Asgrow, respectively. Counts VI and VIII of the complaint alleged breach of warranty of Universal and Asgrow, respectively.

On November 5, 1992, du Pont announced that it had stopped paying Benlate claims because it was not responsible for losses since Benlate did not damage plants. On December 1, 1992, du Pont filed its answer in the lawsuit (answer).

Count I of the complaint relating to the claimed negligence of du Pont alleged in pertinent part:

> 18. The Plaintiffs, FRED HENRY and DONNA HENRY d/b/a FRED HENRY'S PARADISE OF ORCHIDS, utilized Benlate as a fungicide on the products they were grow- ing for sale, consisting primarily of orchids.

> 19. Subsequent to the use of the Benlate in question, the plants developed severe damage * * *

> 20. The damages to the Plaintiffs, FRED HENRY and DONNA HENRY d/b/a FRED HENRY'S PARADISE OF ORCHIDS', plants were a direct and proximate result of the breach of duty and negligence of the Defendant, Du PONT, in the following regards:

a.  The Defendant negligently formulated the product in such a way that it was hazardous to plant life.

b.  The Defendant negligently failed to manufacture the product and/or supervise the manufacture of the product so as to render it safe for use on plants.

c.  The Defendant negligently failed to test and analyze Benlate to determine whether it was, in fact, safe for use on plants.

d.  The Defendant contaminated the Benlate or allowed it to be contaminated by third persons so as to render it hazardous to plants.

e.  The Defendant failed to take the proper precautions to see to it that the Benlate was in a safe and proper condition for use on plants.

f.  The dangerous chemical properties of Benlate were known to the Defendant for a sufficient length of time prior to the sale of the product to the Plaintiffs such that the Defendant was negligent in failing to stop the sale of Benlate.

21.  As a direct and proximate result of the negligence of the Defendant, Du PONT, the Plaintiffs, FRED HENRY and DONNA HENRY d/b/a FRED HENRY'S PARADISE OF ORCHIDS, have suffered and continue to suffer lost profits, loss of business, loss of business reputation, loss of the reputation of FRED HENRY and DONNA HENRY as orchid growers, diminution of sales, incurred additional business expenses, have had a reduction in the value of the business, have lost plants, have suffered a diminution in the value of their nursery as a result of chemical contamination of the soil, and have suffered other consequential losses and damages.

WHEREFORE, the Plaintiffs, FRED HENRY and DONNA HENRY d/b/a FRED HENRY'S PARADISE OF ORCHIDS, demand judgment against the Defendant, Du PONT, including interest and costs and demand trial by jury of all issues triable as of right by jury.

In the answer, du Pont denied, inter alia, the plaintiffs' allegations in count I of the complaint (1) that any Benlate that the plaintiffs may have purchased or used was defective, (2) that the damages to the plaintiffs' orchid plants were a direct and proximate result of the breach of duty and negligence of du Pont, and (3) that, as a direct and proximate result of the negligence of du Pont, the plaintiffs suffered and continued to suffer lost profits, loss of business, loss of business reputation, loss of their reputation as orchid growers, and diminution of sales and incurred additional business expenses, had a reduction in the value of the business, lost plants, suffered a diminution of the value of their nursery as a result of chemical contamination of the soil, and suffered other consequential losses and damages.

In count II of the complaint relating to the claimed strict liability in tort of du Pont, the plaintiffs alleged in pertinent part:

> 24. The product, when sold by the Defendant, Du PONT, was in a defective condition, unreasonably dangerous to the Plaintiffs, FRED HENRY and DONNA HENRY d/b/a FRED HENRY'S PARADISE OF ORCHIDS', plants due to the defects in the design of the product as are more fully set forth above.

>     *      *      *      *      *      *      *

> 26. The Defendant, Du PONT, is therefore strictly liable to the Plaintiffs, FRED HENRY and DONNA HENRY d/b/a FRED HENRY'S PARADISE OF ORCHIDS, for any physical damages or economic losses sustained by the Plaintiffs as a result of the defective condition of the product in question.

27. As a direct and proximate result of the defective condition of the product in question, the Plaintiffs, FRED HENRY and DONNA HENRY d/b/a FRED HENRY'S PARADISE OF ORCHIDS, have suffered and continues [sic] to suffer lost profits, loss of business, loss of business reputation, loss of the reputation of FRED HENRY and DONNA HENRY as orchid growers, diminution of sales, incurred additional business expenses, have had a reduction in the value of the business, have lost plants, have suffered a diminution in the value of their nursery as a result of chemical contamination of the soil, and have suffered other consequential losses and damages.

In the answer, du Pont denied, inter alia, the foregoing allegation in count II of the complaint.

In du Pont's answer, du Pont also alleged certain affirmative defenses against Fred Henry and Donna Henry d/b/a Fred Henry's Paradise of Orchids, including that any damages sustained by the plaintiffs as a result of the incident described in the complaint were caused solely by their negligence, fault, or want of care or were substantially contributed to by their actions or inactions and that Benlate was misused by them or by their agents.

Prior to the trial in the lawsuit, depositions were held by du Pont of possible witnesses, including customers and others. Among the claims made by du Pont during those depositions were that Mr. Henry knowingly sold contaminated orchids, that he did not know how to grow orchids, that he used improper growing media, that he improperly used fertilizer, that he improperly used pesticides, that he improperly stored fertilizers and

pesticides, that he improperly watered his orchids, that he used improper sanitation methods, that he improperly cleaned his equipment, and that he otherwise used other poor growing practices. In a report that du Pont had prepared prior to the trial in the lawsuit, Eugene Moody concluded that "the problems at Henry's Paradise of Orchids, Florida are [due] to poor plant management methods". Du Pont's attacks on Mr. Henry's business reputation and his reputation as an orchid grower were reported in 1993 in certain newspapers.

During the trial in the lawsuit, which lasted from August 23, 1993, through September 23, 1993, du Pont contested Mr. Henry's ability to grow orchids, his knowledge of growing orchids, his growing practices, and his ability to sell orchids. During that trial, Dr. Poole, one of du Pont's experts, testified that he found disease in Mr. Henry's orchid nursery and improper cultural practices. Another of du Pont's experts, James B. Werle (Mr. Werle), a certified public accountant, valued the total loss of the plaintiffs at between $172,995 and $267,803 and valued their inventory at $75,000. That was du Pont's position at the end of the trial in the lawsuit.

During closing arguments to the jury after the trial in the lawsuit, one of du Pont's attorneys argued that Mr. Henry's credibility was at issue and that du Pont had shown that Mr. Henry did not use good growing practices.

At the trial in the lawsuit, an expert witness of the plaintiffs, George C. Reavy (Mr. Reavy), an economist, valued petitioner's total loss at $3,796,118. In arriving at that total loss, Mr. Reavy valued (1) the actual inventory of Mr. Henry and Ms. Estes d/b/a Fred Henry's Paradise of Orchids, which had been counted by Crawford, at $1,508,052, (2) their inventory which had been discarded, but which were represented by tags, at $1,390,078, and (3) their additional orchid plants known as cattleyas at $356,429, for a total inventory value of $3,254,559. Mr. Reavy added eight percent interest to that total inventory value in order to arrive at a total loss of $3,796,118. That was the position of the plaintiffs at the end of the trial in the lawsuit. The attorneys for the plaintiffs in the lawsuit did not present any evidence at the trial in that lawsuit concerning damage allegedly caused by the evidence that du Pont presented during that trial.

During closing arguments to the jury after the trial in the lawsuit, one of the plaintiffs' attorneys argued that the plaintiffs were seeking damages only for their lost inventory, and not for loss of their reputation. That attorney argued in pertinent part as follows:

> Now, this is probably the simplest economic chart ever presented in a case, but basically what it boils down to is this. Remember we had Dr. Reavy come up and explain to you that he looked at the inventory, and what he did, he only did one thing with the inventory,

and that is, he reduced it from retail to wholesale. In other words, when they had done the inventory, they did it on a retail basis, and Dr. Reavy said, no, wait a minute; if he's going to be a wholesale grower, we'll put a wholesale value on it. Dr. Reavy actually reduced the inventory to this 3,254,000 to reflect the wholesale value of the plants. Then, if you may remember, what we did then was I said, now, Dr. Reavy, if you figure in just eight percent a year on that money for the last two years, what are the losses to Fred and Donna because of the loss of their inventory. When you figure in the eight percent for two years, it comes out to $3,796,000.

Now, I submit to you that that's a very conservative figure when you think about it. All we're asking for here is the inventory. We're not asking for business - or the loss of the business or loss of reputation or any of that sort of stuff. That's purely the value of the inventory. [Emphasis added.]

After closing arguments to the jury at the conclusion of the trial in the lawsuit, the Florida Court instructed the jury in relevant part as follows:

If your verdict is for du Pont and Universal, you will not consider the matter of damages, but if you find for Fred Henry and Donna Henry, you should determine and write on the verdict form in dollars the total amount of damage which the greater weight of the evidence shows that they sustained as a result of the incident complained of.

The total amount of loss or damage may be calculated either by considering the value of the lost inventory or considering the lost value of the business immediately before the claimed injury and its value immediately after.

On September 23, 1993, the jury rendered a verdict (jury verdict) in the trial in the lawsuit. As part of the jury verdict, the jury found (1) that du Pont placed Benlate on the

market with a defect which was a legal cause of damage to the plaintiffs, (2) that there was negligence on the part of du Pont which was a legal cause of damage to them, and (3) that there was negligence on the part of the plaintiffs which was a legal cause of damage to them. The jury charged 80 percent of total responsibility to du Pont and 20 percent of total responsibility to the plaintiffs. In other words, the jury found du Pont 80 percent negligent and the plaintiffs 20 percent negligent. The jury further found that the total amount of damages sustained by the plaintiffs, without any reduction for the percentage of responsibility that the jury charged to them, was $3,796,318. That total amount of damages was reduced to $3,037,054 to take account of the jury verdict that the plaintiffs were 20 percent negligent. On motion of du Pont, the judgment of $3,037,054 was reduced to $2,837,054 in order to account for the total of $200,000 in assistance payments that du Pont had made to Mr. Henry in 1991 and 1992. On December 8, 1993, the Florida Court entered an amended final judgment (judgment) in the plaintiffs' favor in the amount of $2,837,054.

On December 17, 1993, du Pont, inter alia, filed a notice of appeal with respect to the judgment. While the judgment was on appeal, the plaintiffs and du Pont engaged in settlement negotiations. As a result of those negotiations, on April

22, 1994, the plaintiffs offered to settle the lawsuit for $2,800,000, and that settlement offer was accepted by du Pont on the same date.  The $2,800,000 settlement negotiated between the parties in the lawsuit was part of a global settlement of some 200 claimants against du Pont and was paid by du Pont as a result of the jury verdict.  Pursuant to the stipulation of settlement to which the parties in the lawsuit agreed on April 22, 1994 (stipulation of settlement), (1) du Pont also agreed to pay the plaintiffs' costs of the lawsuit, (2) those parties executed a document entitled "RELEASE, INDEMNITY AND ASSIGNMENT", and (3) a notice of voluntary dismissal of the appeal of that lawsuit was filed on or about May 13, 1994.

Of the $2,800,000 that du Pont agreed in the stipulation of settlement to pay the plaintiffs in the lawsuit (total settlement amount), du Pont paid $450,000 to their attorneys, $31,139.14 to various third parties, a total of $695,658.26 to Ms. Estes, and a total of $1,623,203 to Mr. Henry (settlement payment), $800,702.60 of which du Pont paid Mr. Henry around June 1994 and $822,500 of which it paid him around August 1994.

Du Pont prepared two Forms 1099-MISC (one for 1993 and one for 1994) relating to the $2,800,000 that it paid pursuant to the stipulation of settlement.  Both of those forms indicated that that amount was nonemployee compensation and that Fred Henry's Paradise of Orchids and Krupnick, Campbell (the law firm which

represented the plaintiffs in the lawsuit) were the recipients of that amount.

## Petitioner's Tax Treatment of the Amounts at Issue

### Petitioner's Tax Treatment of the $150,000 Assistance Payment

Mr. Henry discussed the tax treatment of the $150,000 assistance payment that he received from du Pont in 1992 with Edward William Gargiulo (Mr. Gargiulo), an enrolled agent who had been his return preparer since around 1983. At the time Mr. Gargiulo was considering the issue of the tax treatment of the $150,000 assistance payment, he had never encountered an assistance payment in the preparation of a tax return. Mr. Gargiulo did not know what the character of the $150,000 assistance payment was, and he made no effort to determine the character of that payment. Neither Mr. Gargiulo nor Mr. Henry consulted a tax attorney, the Internal Revenue Service (Service), or a certified public accountant regarding the tax treatment of the $150,000 assistance payment.

Although Mr. Gargiulo did not know what the character of the $150,000 assistance payment was, he nonetheless concluded that no portion of that payment constituted ordinary income of Mr. Henry for 1992. Mr. Gargiulo advised Mr. Henry that he was not required to, and Mr. Henry did not, file a tax return for 1992

since Mr. Henry's income was below the amount at which section 6012 would have required him to file a tax return for that year.

Henry & Estes Associates filed Form 1065 (U.S. Partnership Return of Income) for 1992 (1992 Form 1065), which Mr. Gargiulo prepared. The partners of Henry & Estes Associates that were shown in the 1992 Form 1065 were Fred Henry and Donna Henry. The $150,000 assistance payment that Mr. Henry received from du Pont in 1992 was not reflected in the 1992 Form 1065. Instead, that form showed an ordinary loss from an orchid activity of Henry & Estes Associates in the amount of $11,174.

Petitioner's Tax Treatment of
the $1,623,203 Settlement Payment

At some time before the jury verdict was reached in the trial in the lawsuit, Mr. Henry discussed the tax treatment of any possible recovery that he might receive from du Pont with the lead attorney for the plaintiffs at that time. That attorney was not an expert in tax matters. In addition, after the jury verdict was reached, Mr. Henry raised in a social setting with Mr. Tyler, the certified public accountant who had represented him in settlement discussions with du Pont prior to the commencement of the lawsuit, the tax treatment of any possible recovery that he might receive from du Pont.

Mr. Henry retained Mr. Gargiulo to prepare his tax return for 1994. In preparing that tax return, Mr. Gargiulo asked Mr.

Henry about the character of the payments totaling $1,623,203 that he received from du Pont during 1994. Mr. Gargiulo understood from Mr. Henry that those payments were made because du Pont ruined Mr. Henry's character and he thereby suffered a personal injury. Having been so informed by Mr. Henry, Mr. Gargiulo examined the Master Tax Guide, the CCH tax reporter, and the Service Publication 17. Based on Mr. Gargiulo's examination of those materials and his understanding from Mr. Henry that the payments totaling $1,623,203 that du Pont paid Mr. Henry during 1994 were made because Mr. Henry's character was ruined and he thereby suffered a personal injury, Mr. Gargiulo concluded that Mr. Henry was not required to, and Mr. Henry did not, report those payments as income in his tax return for that year. Neither Mr. Gargiulo nor Mr. Henry retained a tax attorney or a certified public accountant, or consulted the Service, regarding the tax treatment of the $1,623,203 in payments that Mr. Henry received from du Pont during 1994.

Filing of Petitioner's 1994 Tax Return

The date, as extended, on which petitioner was required to file his 1994 tax return was October 15, 1995, which was a Sunday. Consequently, the due date of that tax return was the next business day, which was Monday, October 16, 1995. The envelope in which Mr. Henry's 1994 tax return was mailed to the Service was postmarked on October 17, 1995.

Notice of Deficiency

On September 18, 1996, respondent issued a notice of deficiency (notice) to Mr. Henry.  In the notice, respondent determined that Mr. Henry had failed to report as income (1) for 1992 the $150,000 assistance payment that he received from du Pont in that year and (2) for 1994 the $1,623,203 in payments that Mr. Henry received from du Pont during that year.  Respondent also determined in the notice that Mr. Henry is liable (1) for additions to tax under 6651(a)(1) for 1992 for failure to file a tax return and for 1994 for failure to file timely his tax return and (2) for 1994 for the accuracy-related penalty under section 6662(a) because of a substantial understatement of income tax under section 6662(b)(2).

## OPINION

Petitioner bears the burden of proving that the determinations in the notice are erroneous.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

The $150,000 Assistance Payment

Petitioner received the $150,000 assistance payment from du Pont in 1992 and did not report that payment as income for that year.  Respondent determined that the $150,000 assistance payment is includible in petitioner's income for 1992.  The parties stipulated that 70 percent of that payment is allocable to petitioner and that 30 percent of that payment is allocable to

Ms. Estes.  Consequently, in the event that we were to hold, as we do, that the $150,000 assistance payment is income that must be reported for 1992, pursuant to the parties' stipulation, petitioner would be required to include in his gross income for that year only 70 percent of that payment.

Petitioner contends that the $150,000 assistance payment is not income.  In support of that contention, petitioner advances the following alternative positions:

> The purpose of the payment as stated by Dupont's Benlate resolution manager was to mitigate losses, for good will, and retain customers.  As such it consti-tuted a gift.  A gift is defined in Black's law dictio-nary as a transfer of property without consideration (a right, benefit, forbearance, or detriment exchanged). There was no consideration here, thus the payment was a gift.  Gifts are not taxable under IRC §102(a)(2).  A gift required donative intent but that intent does not have to have an altruistic motive and can be motivated by self interest.

> A casual reading of the assistance receipt would made it appear that there was no need to repay the amount.  However, a closer reading reveals that the "full amount" (emphasis added) of the assistance pay-ment will be subtracted from any settlement or judge-ment.  It does not say that if the settlement or judge-ment is less than the amount of the assistance payment the difference would not have to be repaid.  A zero verdict would require the return of the whole assis-tance payment.  This is consistent with the opinion of Dupont's Benlate resolution manager stated he and other Dupont officials believed that Dupont has the right to be reimbursed for the amount of the assistance payment.

> An alternate way to view the assistance payment based on the receipt that it was a no interest loan which would have to be repaid.  Loans are not income and are not taxable.  (Loans do not require a prom-

issory note nor interest as suggested by the respondent.)

A second alternate way of looking at the assistance payment based on the receipt that it was a contingent payment on the claim which would have to be repaid at the time of settlement or judgement. Since Dupont vigorously contested liability before the end of 1992, thus there was a clear possibility that a repayment would be required. There was no assurance the petitioner could retain the funds. It could not have been an out right partial payment since there was a good chance it would have to be returned. [Reproduced literally.]

Respondent counters that the $150,000 assistance payment that Mr. Henry received from du Pont in 1992 is income for that year. In support of that position, respondent argues on brief that

the payment in question was not restricted and was not subject to repayment. It was in the nature of a partial payment which would be accounted for in the final settlement or judgment, as it was in this case. The petitioner had every claim of right to this money under the principles of North American Oil Consolidated v. Burnet, 286 U.S. 417 (1932).

*     *     *     *     *     *     *

Except as otherwise provided in the Code, a taxpayer must include in gross income "all income from whatever source derived." I.R.C. § 61(a). The Supreme Court has long recognized that the definition of gross income sweeps broadly and reflects Congress' intent to exert the full measure of its taxing power and to bring within the definition of income any "accession to wealth." United States v. Burke, 504 U.S. 229, 223 (1992), rev'g 929 F.2d 1119 (6th Cir. 1991). See also Commissioner v. Schleier, 515 U.S. 232 (1995). Accordingly, any receipt of funds or other accession to wealth received by a taxpayer is presumed to be gross income, unless the taxpayer can prove that the accession fits into a specific exclusion created by other

sections of the Code. See Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429-431 (1955). * * *

* * * * * * *

* * * There is no evidence that the assistance payments were gifts. They were paid to persons and businesses who were damaged by a product of du Pont. As indicated by du Pont, their rough rule of thumb was to make assistance payments of no more than one third of the value of the damage caused. * * * The record establishes that the petitioner was offered settlements in excess of $500,000 and $900,000 in 1992. * * * Clearly, du Pont and the petitioner recognized that du Pont owed petitioner substantially more than the a-mounts of the assistance payments. They were not gifts, but partial compensation for the damage and made in advance to mitigate against further consequential loss by the petitioner.

As to the loan theory, du Pont never required repayment. * * * The petitioner was destitute and his only valuable asset was the cause of action against du Pont. * * * None of the normal indicia of a loan are present, no note, no repayment schedule, no interest, and no security. * * * Clearly, the assistance payment was partial payment in compensation for the damage done by Benlate.

On the record before us, we agree with respondent that the $150,000 assistance payment is income for 1992. During 1991, du Pont realized that its fungicide Benlate may be responsible for damage to plants, established a Benlate claims process, and retained Crawford to work in the field to assist it in evaluating alleged Benlate damage and processing claims for damage payment. Beginning in 1991 and continuing into 1992, du Pont made as-sistance payments to persons who filed claims with du Pont for alleged damage due to Benlate. The intention of du Pont in

making those payments was to assist the claimants to pay bills and other expenses that they had difficulty in paying due to the alleged damage to their business as a result of Benlate, to help reestablish their businesses, to mitigate losses, and for goodwill. Du Pont made assistance payments to claimants only after having received their respective claims and after having them evaluated by Crawford. As a rule of thumb, du Pont limited the amount of any assistance payment that it made to one-third of the amount of any anticipated settlement between it and a claimant of that claimant's claim for damage. Thus, at the time du Pont made an assistance payment to a claimant, it expected that it would be paying that claimant an additional amount equal to around twice as much as the amount of that assistance payment. We believe that explains why it was expected, and the assistance receipt provided, that any assistance payment that du Pont had made to a claimant would be deducted as having been paid from any ultimate settlement or judgment relating to Benlate claims by that claimant.

In 1991, Mr. Henry began negotiating with du Pont concerning the damage to his orchid plants caused by Benlate. Around September or October 1991, a representative of du Pont inspected the orchid plants in Mr. Henry's possession and informed him that those plants had been damaged by Benlate. At the end of November 1991, Mr. Henry requested, and at the end of December 1991, Mr.

Henry received, the $50,000 assistance payment from du Pont. In late January 1992, Mr. Henry requested, and in early February 1992, Mr. Henry received, the $150,000 assistance payment from du Pont. On the record before us, we find that petitioner has failed to show that he was under any restrictions as to how he used either the $50,000 assistance payment or the $150,000 assistance payment or that he did not have full control over how he used each of those payments. We further find on that record that petitioner has failed to establish that he was under an obligation (contingent or otherwise) to return either the $50,000 payment[2] or the $150,000 payment to du Pont or that there were any indicia of a loan associated with either of those payments. The record does show that at the respective times du Pont made the $50,000 assistance payment and the $150,000 assistance payment to Mr. Henry it expected to pay him substantial, additional amounts with respect to his claimed damage due to his use of Benlate. Indeed, the record establishes that du Pont offered Mr. Henry a settlement of $509,742 by letter dated March

---

[2]Although du Pont's Benlate resolution manager, who was in charge of assistance payments, and certain other du Pont officials considered that du Pont had a right to ask that an assistance payment be paid back to it, they never sought a formal opinion from du Pont's attorneys on the question. Moreover, we do not believe that, because du Pont's Benlate resolution manager and certain other du Pont officials considered that du Pont had a right to ask that an assistance payment be paid back to it, du Pont had the legal right to require that an assistance payment be returned to it.

19, 1992, from Crawford and a settlement of $965,678 by letter dated June 24, 1992, from Crawford. It was not until November 5, 1992, that du Pont announced that it had stopped paying Benlate claims because it was not responsible for losses since Benlate did not damage plants. Although du Pont made that announcement in early November 1992, it did not require Mr. Henry in 1992 (or at any other time) to repay the assistance payments that it had made to him in 1991 and 1992. In fact, du Pont never required any person to repay any assistance payments that it had made. Although du Pont never issued a Form 1099 for any assistance payment that it made and although its tax counsel advised du Pont that it was not required to, and could not, issue such a form with respect to any such payment, those facts do not control our resolution of whether, under the facts established by the record in this case and the applicable law, the $150,000 assistance payment that du Pont made to Mr. Henry in 1992 is income for that year.

Based on our examination of the entire record in this case, we find that petitioner has failed to establish that the $150,000 assistance payment that du Pont made to him in early February 1992 is a gift or, in the alternative, a loan. We further find on that record that petitioner has failed to show that the $150,000 assistance payment is not income. See Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1955). Moreover, assuming

arguendo that petitioner had been under a contingent obligation to return the $150,000 assistance payment to du Pont, we find on the instant record that petitioner has failed to establish that he did not receive the $150,000 assistance payment under a claim of right.  See North Am. Oil Consol. v. Burnet, 286 U.S. 417, 424 (1932).

We turn now to Mr. Henry's alternative argument that "if the [$150,000 assistance] payment could be considered an advance payment, it is clear under the law as it existed in 1992 that the payment was excluded from income due [to] damage to the Petitioner's livelihood including reputation."  We presume that petitioner is arguing that the $150,000 assistance payment is to be excluded from income under section 104(a)(2).  On the record before us, we reject any such argument.

Section 104(a)(2) provides that "gross income does not include * * * the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness".  There is no evidence in the record that when petitioner requested in late January 1992, and received in early February 1992, the $150,000 assistance payment he was making any claims of personal injuries or even any claims of loss of business reputation and/or loss of reputation as an orchid grower.  To the contrary, the record establishes that at those times Mr. Henry was negotiating with du

Pont concerning the damage to the orchid plants of Fred Henry's Paradise of Orchids and other plants in his possession, which was allegedly caused by Benlate. The record also establishes that petitioner was requesting an additional assistance payment in the amount of $150,000 in order to

> 1) Pay off the remainder of my debts. 2) To live up to my obligation as required by Florida state law to buy back damaged and dead plants from my customers. 3) To put deposits on various groups of plants from Thailand and Hawaii so that I will have plants available to me when the final settlement occurs and I can get back into business without further delay. * * *

Moreover, the record shows that at an undisclosed time prior to March 19, 1992, Mr. Henry submitted to Crawford a claim against du Pont as a result of his use of Benlate in the total amount of $2,721,700, which consisted of lost past and future sales, lost inventory, liability to customers pursuant to Florida law, and miscellaneous costs. By letter to Mr. Henry dated March 19, 1992, Crawford proposed on behalf of du Pont a settlement with respect to that claim in the total amount of $509,742 for pro-jected lost sales and lost inventory. By letter dated June 16, 1992, Mr. Tyler, the certified public accountant retained by Mr. Henry, wrote to Crawford on behalf of Mr. Henry and countered du Pont's proposed settlement of $509,742 with a proposed settlement of $5,143,952 which consisted of claims for lost inventory, interest, liability to customers under Florida law, lost profits and lost sales, and miscellaneous costs. The record does not

show that it was the intention of du Pont when it made the $150,000 assistance payment to Mr. Henry to compensate him on account of personal injuries. To the contrary, the record establishes that the intention of du Pont in making assistance payments was to assist the claimants to pay bills and other expenses that they had difficulty in paying due to the alleged damage to their businesses caused by Benlate, to help reestablish their businesses, to mitigate losses, and for goodwill.

Based on our examination of the entire record in this case, we find that Mr. Henry has failed to show that the $150,000 assistance payment is not income for 1992. Pursuant to the parties' stipulation that 70 percent of that payment is allocable to Mr. Henry, we hold that Mr. Henry must include in his gross income for that year 70 percent of the $150,000 assistance payment, or $105,000.

Addition to Tax Under Section 6651(a)(1)--1992

Petitioner did not file a tax return for 1992.[3] Respondent determined in the notice that he is liable under section 6651(a)(1) for his failure to file a tax return for that year.

---

[3]Henry & Estes Associates, a partnership consisting of Mr. Henry and Ms. Estes, filed a Form 1065 for 1992. The 1992 Form 1065 did not reflect the $150,000 assistance payment that du Pont made to Mr. Henry in February 1992. Instead, that form reflected a loss from the orchid activity of Henry & Estes Associates.

Petitioner contends that he was not required to file a tax return

for 1992.  In support of that contention, petitioner asserts:

> If there was no income there was no failure to file.
> Even if there was income, the failure to file penalty
> is not applicable where the failure to file is due to
> reasonable cause and there is no willful neglect.  The
> Petitioner did not consider the [$150,000] assistance
> payment income and his tax account[ant] did not con-
> sider it income.  The Petitioner['s] livelihood was
> destroyed and it was reasonable for them to conclude
> that any payment relating to that law suit would also
> be excludable from income.  To eliminate the penalty
> the Petitioner does not have to win but only have a
> reasonable basis for his actions.
>
> Respondent counters:
>
> Petitioner is not disputing the fact of nonfiling, he
> is apparently contending that his failure to file was
> due to reasonable cause.  In his defense, petitioner
> contends that he and his return preparer did not know
> what the tax treatment of the assistance payments
> should have been.  Petitioner and his return preparer
> failed to consult a tax attorney, the Internal Revenue
> Service, or a certified public accountant concerning
> the tax treatment of the 1992 assistance payment.
> Moreover, at the time * * * he considered the issue of
> the tax treatment of the assistance payment, peti-
> tioner's return preparer had never encountered an
> assistance payment in the preparation of an income tax
> return. * * * Such a defense is no defense at all.
> Clearly petitioner was under a nondelegable duty to
> seek competent tax advice rather than conclude that he
> did not need to file since he did not know what the tax
> treatment of the payment should be. * * *

The addition to tax under section 6651(a)(1) does not apply

where the failure to file was due to reasonable cause and not to

willful neglect.  See sec. 6651(a)(1).  Reasonable cause under

section 6651 means the exercise of ordinary business care and

prudence.  See sec. 306.6651-1(c)(1), Proced. & Admin. Regs.

Willful neglect is defined as a conscious, intentional failure or reckless indifference. See United States v. Boyle, 469 U.S. 241, 245 (1985).

We consider first whether petitioner's failure to file a tax return for 1992 was due to reasonable cause and not to willful neglect because of his claimed reliance on his return preparer, Mr. Gargiulo. Mr. Gargiulo advised petitioner that he was not required to file a tax return for that year since he did not have the amount of income that would require him to file such a tax return under section 6012. In this connection, Mr. Gargiulo testified in pertinent part about the reason why he did not believe that any portion of the $150,000 assistance payment is includible in petitioner's income for 1992, as follows:

> There was just nothing that duPont ever told us what's that -- what kind of money it was -- whether it was a goodwill money for the problems they were causing Mr. Henry or whether it was a loan to Mr. Henry to be paid later. The character of the money, I didn't know what it was.

Nothing in the record indicates that Mr. Henry, who was aware of the circumstances surrounding du Pont's decision to make the $150,000 assistance to him in early February 1992, shared that information with Mr. Gargiulo. Nor does the record show that Mr. Gargiulo asked du Pont to inform him of those circumstances. On the instant record, we find that petitioner has failed to show that it was reasonable for him to rely on the

advice of Mr. Gargiulo that it was unnecessary to file a tax return for 1992.

Even though we have found that it was not reasonable for petitioner to rely on the advice of Mr. Gargiulo with respect to his failure to file a 1992 tax return, we nonetheless find on the record before us that that failure was due to reasonable cause and not to willful neglect. Although petitioner was aware of the circumstances relating to du Pont's decision to make the 1992 assistance payment to him, he also knew that du Pont decided in November 1992 to stop paying Benlate claims. Du Pont's decision to stop paying Benlate claims, coupled with the fact that du Pont did not issue a Form 1099 to petitioner for 1992 with respect to the $150,000 assistance payment, could have raised a reasonable question in the mind of petitioner, who is not an expert in tax matters, as to whether that payment was income for 1992. On the record before us, we find that petitioner's failure to file a tax return for 1992 was due to reasonable cause and not to willful neglect. Accordingly, we hold that petitioner is not liable for 1992 for the addition to tax under section 6651(a)(1).

The $1,623,203 Settlement Payment

Respondent determined that the settlement payment of $1,623,203 which petitioner received from du Pont during 1994 is to be included in his gross income for that year. It is petitioner's position that that payment constitutes an amount of

"damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness" under section 104(a)(2) and that therefore that payment is to be excluded from his gross income for 1994. In support of that position, petitioner contends that du Pont agreed to pay the total settlement amount of $2,800,000 pursuant to the stipulation of settlement of the lawsuit as damages for the loss of the plaintiffs' business reputation and the loss of their reputation as orchid growers, that such damages are personal injuries within the meaning of section 104(a)(2), and that consequently the $1,623,203 settlement payment that he received out of the $2,800,000 total settlement amount constitutes "the amount of * * * damages received * * * on account of personal injuries" that is to be excluded from his gross income under that section. Respondent counters that the record does not support petitioner's contentions. We agree with respondent.

In Commissioner v. Schleier, 515 U.S. 323, 336-337 (1995), the Supreme Court of the United States summarized the requirements of section 104(a)(2) as follows:

> In sum, the plain language of § 104(a)(2), the text of the applicable regulation, and our decision in Burke establish two independent requirements that a taxpayer must meet before a recovery may be excluded under § 104(a)(2). First, the taxpayer must demonstrate that the underlying cause of action giving rise to the recovery is "based upon tort or tort type rights"; and second, the taxpayer must show that the

damages were received "on account of personal injuries or sickness."  * * *

Respondent concedes that Mr. Henry satisfies the first requirement set forth in Schleier.  However, respondent contends that Mr. Henry has failed to establish that he satisfies the second requirement set forth in Schleier because he has failed to show that the $1,623,203 settlement payment that he received from du Pont during 1994 was received "on account of personal injuries or sickness" within the meaning of section 104(a)(2).

The second requirement set forth by the Supreme Court in Commissioner v. Schleier, supra (as does the first requirement) involves dual inquiries.  In this case, those inquiries are whether the claims of loss of business reputation and loss of reputation as orchid growers, which Mr. Henry and Ms. Estes d/b/a Fred Henry's Paradise of Orchids alleged in the complaint in the lawsuit resulted from the negligence of du Pont and its defective product Benlate, constitute personal injuries within the meaning of section 104(a)(2) and, if so, whether the total settlement amount of $2,800,000, and consequently the $1,623,203 settlement payment that petitioner received during 1994, are damages received on account of those injuries.

We address first Mr. Henry's contention that the $2,800,000 total settlement amount, and consequently the $1,623,203 settlement payment, which the parties stipulated was paid as a

result of the jury verdict, was paid on account of the loss of the plaintiffs' business reputation and the loss of their reputation as orchid growers. The record in this case, which includes portions of the record in the lawsuit, does not support petitioner's contention that all, or even a portion, of the total settlement amount, or the settlement payment, was paid on account of the loss of the plaintiffs' business reputation or the loss of their reputation as orchid growers. In fact, the attorney in the lawsuit for the plaintiffs, Mr. Henry and Ms. Estes d/b/a Fred Henry's Paradise of Orchids, told the jury in his closing arguments that the plaintiffs were not claiming loss of reputation. He stated:

> <u>All we're asking for here is the inventory</u>. <u>We're not asking for</u> business - or the loss of the business or <u>loss of reputation</u> or any of that sort of stuff. That's purely the value of the inventory. [Emphasis added.]

The foregoing statements by the plaintiffs' attorney to the jury in the lawsuit are consistent with the evidence submitted by the plaintiffs to that jury with respect to the loss that they claimed they suffered as a result of their applying Benlate to the orchid plants of Fred Henry's Paradise of Orchids. That evidence consisted of the testimony of the plaintiffs' expert, an economist, that the value of the plaintiffs' inventory of orchid plants was $3,254,559, to which that expert added eight percent interest in order to arrive at the total loss that the plaintiffs

claimed in that lawsuit, or $3,796,118. Du Pont also presented evidence in the lawsuit through an expert who valued the plaintiffs' inventory at $75,000 and who concluded that the total loss of the plaintiffs was between $172,995 and $267,803. No other witness testified in the lawsuit concerning the amount of damages sustained by the plaintiffs.

In advancing his contention that the $2,800,000 total settlement amount, and consequently the $1,623,203 settlement payment, was paid on account of the loss of the plaintiffs' business reputation and the loss of their reputation as orchid growers, Mr. Henry reasons as follows:

> Proximate cause is the causal connection between the tortfeasor actions and the injury. This is the traditional "but for" test. Dupont negligently placed on [sic] defective product on the market, that product caused damage to orchids, those damaged orchids were sold by an individual who has a reputation of producing and selling high quality orchids, the orchids were generally sold to people knowledgeable about orchids, the orchids became deformed, failed to flower, and died (definitely not high quality orchids), the reputation for selling and producing high quality plants was destroyed by the selling plants which became deformed and died. But for the Dupont's negligence the petitioner's reputation would not have been damaged. There was no intervening cause. * * *

Not only is petitioner's "but-for" argument rejected by the record in this case, which establishes that the $2,800,000 total settlement amount, and consequently the $1,623,203 settlement payment, was not paid on account of the loss of the plaintiffs' business reputation or the loss of their reputation as orchid

growers, that argument also was rejected, as a matter of law, by the Supreme Court in O'Gilvie v. United States, 519 U.S. 79 (1996). In O'Gilvie, the Supreme Court held that the "on account of" test of section 104(a)(2) requires more than a "but-for" connection between the damages and a personal injury. That test, according to the Supreme Court, requires that the damages be awarded by reason of, or because of, the personal injury, and not another cause. See O'Gilvie v. United States, supra. On the record before us, we find that petitioner has failed to establish that all or any portion of the $2,800,000 total settlement amount, or the $1,623,203 settlement payment, was paid by reason of, or because of, the loss of the plaintiffs' business reputation or the loss of their reputation as orchid growers.

Although we need not do so in order to resolve the question presented under section 104(a)(2), for the sake of completeness we shall address petitioner's contention that "Damage to reputation is clearly personal injury for the purpose of IRC §104(a)(2)." While not altogether clear, petitioner appears to be taking the position that damage to reputation is, as a matter of law, personal injury within the meaning of section 104(a)(2). We rejected such an argument in Fabry v. Commissioner, 111 T.C. 305 (1998), and we reject any such argument here.

In Fabry, the taxpayers (the Fabrys) operated a nursery in which they grew ornamental plants, and they developed a rep-

utation for growing quality plants.  See Fabry v. Commissioner,
supra at 306.  In connection with the operation of their nursery,
the Fabrys used Benlate on the plants that they grew and suffered
extensive damage to those plants, which they claimed was a result
of their use of Benlate.  See id. at 307.  The Fabrys sued du
Pont in the Court of the Ninth Judicial Circuit in and for Orange
County, Florida.  In that suit, they alleged that du Pont had
allowed Benlate to become contaminated so as to cause the damages
that they suffered from having used it on their stock of plants.
The Fabrys demanded a judgment for monetary damages from du Pont
under theories of negligence and strict liability in tort.  Under
both theories, the Fabrys claimed that they sustained damages in
the form of the lost value of destroyed or injured plants, damage
to their business reputation, lost income, and the lost value of
their business.  After mediation, the suit which the Fabrys
instituted against du Pont was concluded pursuant to a stip-
ulation under which du Pont agreed to pay them $3,800,000.  See
id. at 307.

The parties in Fabry v. Commissioner, supra, agreed that
$500,000 of the $3,800,000 which du Pont paid the Fabrys was
allocable to damages for loss of business reputation.  See id. at
307.  The question presented to us in Fabry was whether, as
argued by the Fabrys, that $500,000 payment was to be excluded
from gross income under section 104(a)(2).  See id. at 308.  In

advancing their position, the Fabrys maintained that injury to

business reputation is, as a matter of law, a personal injury

within the meaning of section 104(a)(2).  See id. at 309.  We

rejected that argument.  See id. at 310-311.  In so holding, we

stated:

> In Threlkeld v. Commissioner, supra, we decided not to
> follow our decision in Roemer v. Commissioner, 79 T.C.
> 398 (1982), revd. 716 F.2d 693 (9th Cir. 1983), in
> which we distinguished between injury to personal
> reputation and injury to business reputation and held
> that damages awarded on account of defamation resulting
> in injury to business reputation did not give rise to
> damages received on account of personal injuries within
> the meaning of section 104(a)(2).  We did not, in
> Threlkeld, adopt a per se rule that damages received on
> account of injury to an individual's business reputa-
> tion are excludable under section 104(a)(2).  We de-
> scribed the necessary determination as presenting a
> question of fact.  Threlkeld v. Commissioner, supra at
> 1305.  We said that the determination depended on the
> nature of the claim presented, and we looked to all the
> facts and circumstances of the case, including the
> State law characterization of the claim in question (a
> claim for malicious prosecution) to determine the
> nature of that claim.  Id. at 1307-1308.  We found that
> an action for malicious prosecution is similar to an
> action for defamation and concluded that it would be
> classified as an action for personal injuries under
> Tennessee law.  Id. at 1307.  We concluded that the
> payment received for the release of the taxpayer's
> claims against the defendant for damage to the tax-
> payer's professional reputation was excludable under
> section 104(a)(2).

Id. at 310.

Having rejected the taxpayers' argument in Fabry that injury

to business reputation is, as a matter of law, a personal injury

within the meaning of section 104(a)(2), we examined the facts

and circumstances surrounding the $500,000 payment at issue in that case in order to determine whether that payment was made on account of personal injuries, as that term is used in section 104(a)(2). See id. at 311-314. We examined, inter alia, the complaint that the Fabrys had filed against du Pont in the local Florida Court and the mediation that preceded settlement of that suit. See id. at 312-314. In that complaint, the Fabrys sought damages on theories of negligence and strict liability in tort. See id. at 313. They alleged as essential facts in that complaint that the Benlate that they purchased was defective and proved detrimental to their nursery products and that, as the direct and proximate result of their use of Benlate, they suffered, inter alia, damage to their business reputation. See id. at 312-313. We pointed out in Fabry v. Commissioner, supra at 313, that nowhere in the complaint filed by the Fabrys did they use the term "personal injuries" to describe the injuries that they claimed to have suffered as a result of their use of Benlate and that none of the other injuries alleged in the complaint (i.e., plant damage, lost profits, or loss of going-concern value) is a personal injury. We noted in Fabry that the Fabrys did not argue, and we did not believe, that all injuries caused by a defendant's negligence or attributable to a defendant under a theory of strict liability in tort necessarily are personal injuries within the meaning of section 104(a)(2). See id. at

313. We also acknowledged that the plant damage alleged by the Fabrys against du Pont "no doubt injured their business and, consequentially, their business reputation." Id. at 313. However, we held that nowhere in the complaint is there any claim of personal injuries, as that term is used in section 104(a)(2). See id. at 313. We further held that there was no evidence of a claim for personal injuries in our examination of the mediation that preceded the settlement of the suit brought by the Fabrys against du Pont. See id. at 313-314.

Based on our examination of all the facts and circumstances surrounding the $500,000 payment that was made on account of the Fabrys' claim of injury to their business reputation, we held in Fabry v. Commissioner, supra at 314:

> Since the record of the lawsuit that is before us does not include any claim for personal injuries within the meaning of section 104(a)(2), we do not believe that the claim for injury to business reputation was on account of personal injuries, as that term is used in section 104(a)(2). * * *

We have examined all of the facts and circumstances that are disclosed by the record before us surrounding the lawsuit by Mr. Henry and Ms. Estes d/b/a Fred Henry's Paradise of Orchids against, inter alia, du Pont and the settlement of that lawsuit while the jury verdict was on appeal. In the complaint in the lawsuit, Mr. Henry and Ms. Estes d/b/a Fred Henry's Paradise of Orchids sought damages from, inter alia, du Pont on theories of

- 48 -

negligence and strict liability in tort.  The plaintiffs in that lawsuit alleged as essential facts that they used Benlate on the orchid plants that they were growing, that those plants suffered severe damage, that the damages to the plaintiffs' orchid plants were the direct and proximate result of the breach of duty and negligence of du Pont, that du Pont sold Benlate in a defective condition, that du Pont is strictly liable to the plaintiffs "for any physical damages or economic losses sustained by the Plaintiffs as a result of the defective condition of the product in question", and that, as a direct and proximate result of the negligence of du Pont and the defective condition of Benlate, the plaintiffs suffered

> lost profits, loss of business, loss of business reputation, loss of the reputation of FRED HENRY and DONNA HENRY as orchid growers, diminution of sales, incurred additional business expenses, have had a reduction in the value of the business, have lost plants, have suffered a diminution in the value of their nursery as a result of chemical contamination of the soil, and have suffered other consequential losses and damages.

Nowhere in the complaint in the lawsuit filed by Mr. Henry and Ms. Estes d/b/a Fred Henry's Paradise of Orchids or in the documents relating to the settlement of that lawsuit that are part of the record in the instant case did the plaintiffs use the term "personal injuries" to describe the injuries that they claimed to have suffered as a result of their use of Benlate. See Fabry v. Commissioner, 111 T.C. at 313.  Nor did they allege

therein a claim of defamation or any other nonphysical, personal tort. See id.

We do not understand petitioner to be arguing, and in any event we do not believe, that the injuries alleged in the lawsuit by the plaintiffs of lost profits, loss of business, diminution of sales, additional business expenses, a reduction in the value of the plaintiffs' business, lost plants, and a diminution of the value of the plaintiffs' nursery as a result of contamination of the soil are personal injuries. We do not understand petitioner to be claiming, and in any event we do not believe, that the cause of the injuries that the plaintiffs alleged in the lawsuit, i.e., negligent manufacture and sale of a defective product, necessarily results in a personal injury within the meaning of section 104(a)(2). Although the damage to the orchid plants of the plaintiffs that they alleged in the complaint in the lawsuit no doubt injured their business and, consequentially, their business reputation, nowhere in the complaint in the lawsuit or in the documents relating to the settlement of that lawsuit that are before us is there any claim of personal injuries, as that term is used in section 104(a)(2). See id. at 313.

On the record before us, we find that the plaintiffs' claims for loss of business reputation and loss of reputation as orchid growers are not on account of personal injuries within the meaning of section 104(a)(2). See id. at 314. On that record,

we further find that, assuming arguendo that the $1,623,203 settlement payment which petitioner received from du Pont during 1994 had been paid for loss of his business reputation and loss of his reputation as an orchid grower, that payment was not made on account of personal injuries within the meaning of section 104(a)(2).

Based on our examination of the entire record in this case, we find that petitioner has failed to establish that the $1,623,203 settlement payment that he received during 1994 was made on account of personal injuries within the meaning of section 104(a)(2). Accordingly, we sustain respondent's determination to include that payment in petitioner's gross income for that year.[4]

Addition to Tax Under Section 6651(a)(1)--1994

Respondent determined that petitioner did not timely file his 1994 tax return. Petitioner concedes that the Service received that tax return after October 16, 1995, the date on which it was due, and that the envelope in which it was mailed to the Service was postmarked on October 17, 1995. He contends, however, that he mailed his 1994 tax return on October 16, 1995,

---

[4]In the event that we were to hold, as we have, that the settlement payment is not to be excluded from petitioner's gross income under sec. 104(a)(2), petitioner advances several alternative theories regarding the characterization of that payment for tax purposes. We have considered all of those alternative theories, and on the record before us we reject them.

the date on which it was due, and that consequently it should be treated as timely filed. We disagree.

On the instant record, Mr. Henry must comply with the requirements of section 7502(a), the section of the Code which permits, inter alia, a tax return that is delivered to the Service after its due date to be treated as timely filed. Section 7502(a) provides in pertinent part:

SEC. 7502(a). General Rule.--

(1) Date of delivery.--If any return * * * re-quired to be filed * * * on or before a prescribed date * * * is, after * * * such date, delivered by United States mail to the * * * office with which such return * * * is required to be filed * * * the date of the United States postmark stamped on the cover in which such return * * * is mailed shall be deemed to be the date of delivery * * *

(2) Mailing requirements.--This subsection shall apply only if--

(A) the postmark date falls * * * on or be-fore the prescribed date--

(i) for the filing (including any ex-tension granted for such filing) of the re-turn * * * and

(B) the return * * * was, within the time prescribed in subparagraph (A), deposited in the mail in the United States in an envelope or other appropriate wrapper, postage prepaid, properly ad-dressed to the * * * office with which the return * * * is required to be filed * * *

Even if, as petitioner testified, he timely mailed his 1994 tax return on October 16, 1995, section 7502(a) does not permit us to treat that return as timely filed. That is because the

date postmarked on the envelope in which petitioner's 1994 tax return was delivered to the Service is October 17, 1995, and that date is after the date on which that return was required to be filed.

On the record before us, we find that petitioner has failed to establish that he timely filed his 1994 tax return. On that record, we further find that petitioner is liable for 1994 for the addition to tax under section 6651(a)(1).[5]

Accuracy-Related Penalty Under Section 6662(a)--1994

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the underpayment of tax resulting from a sub- stantial understatement of income tax. An understatement is equal to the excess of the amount of tax required to be shown in

---

[5]We note that Mr. Henry had it within his power to avoid the problem presented in this case. He testified that he mailed his 1994 tax return certified mail because his accountant "always wants it done certified mail." Indeed, the copy of his 1994 tax return that is in the record has typewritten at the top of it: "CERTIFIED MAIL NO. Z 721 020 113". If Mr. Henry had obtained and introduced into evidence a receipt for the certified mailing of his 1994 tax return which bore the actual date of the mailing of that tax return, the date marked on any such receipt would have been treated as the date of the U.S. postmark for purposes of sec. 7502(a). See sec. 7502(c)(2); sec. 301.7502-1(c)(2), Proced. & Admin. Regs. If that date were Oct. 16, 1995 (or an earlier date), petitioner would have satisfied the requirement of sec. 7502(a)(2)(A) that the U.S. postmark fall on or before the date (as extended) on which his tax return was due. Mr. Henry either chose not to obtain a receipt for the certified mailing of his 1994 tax return or he chose not to present at trial the receipt that he did obtain. In either event, he appropriately bears the risk that such inaction entails.

the tax return less the amount of tax shown in the tax return, see sec. 6662(d)(2)(A), and is substantial in the case of an individual if it exceeds the greater of 10 percent of the tax required to be shown or $5,000, see sec. 6662(d)(1)(A).  The amount of the understatement is reduced to the extent that it is attributable to an item for which there was substantial authority.  See sec. 6662(d)(2)(B)(i).[6]

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith.  See sec. 6664(c)(1).  The determination of whether the taxpayer acted with reasonable cause and in good faith depends upon the pertinent facts and circumstances.  See sec. 1.6664-4(b)(1), Income Tax Regs.  The most important factor is the extent of the taxpayer's efforts to assess his or her proper tax liability.  See id. Reliance on the advice of a professional, such as an accountant, does not necessarily demonstrate reasonable cause and good faith unless, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith.  See id. In the case of claimed reliance on the accountant who prepared the taxpayer's tax return, the

_____

[6]The amount of the understatement also is reduced to the extent that it is attributable to an item that was adequately disclosed in the tax return and was treated by the taxpayer in a manner having a reasonable basis.  See sec. 6662(d)(2)(B)(ii).

taxpayer must establish that correct information was provided to the accountant and that the item incorrectly claimed or reported in the return was the result of the accountant's error. See Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978).

Respondent determined that petitioner is liable for 1994 for the accuracy-related penalty under section 6662(a) due to a substantial understatement of income tax under section 6662(b)(2). Respondent determined that Mr. Henry's substantial understatement of income tax for 1994 is attributable to the disallowance of a $3,018 loss that he claimed in Schedule F of that tax return and his failure to include in his tax return for 1994 the $1,623,203 settlement payment that he received from du Pont during that year.

Petitioner makes no argument under 6662(a) with respect to the accuracy-related penalty attributable to the disallowance of the loss that he claimed in Schedule F of his 1994 tax return. With respect to the accuracy-related penalty attributable to his failure to include the $1,623,203 settlement payment as income in that tax return, Mr. Henry asserts in his opening brief:

> In regard to the penalties under IRC 6662, the taxpayer has reasonable basis for his position. The is substantial case law as set forth in this brief, the law is changing in regard to exclusions under IRC 102 based on the U.S. Supreme Courts decision in Scheier which was decided in 1995. In addition, the facts in this situation is substantially close to the factual situations in the cases cited. [Reproduced literally.]

In his reply brief, Mr. Henry further contends:

> In regard to penalties, the petitioner relied on the advice of his tax preparer, an enrolled agent. An enrolled agent has sufficient training in tax. See Treasurer [sic] Circular 230. Thus the petitioner was entitled to rely on his advice. The advice given was based on the generally available tax information at the time and was based on recognized tax publications. The Schleier case would not have shown in any publications at the time of the advice. * * *

We address first petitioner's claimed reliance on his return preparer, Mr. Gargiulo. In this regard, the following testimony of Mr. Gargiulo is instructive:

> Q   So who provided you with the characterization of the money. In other words, how did you come to understand what the character of this money in '94 was?

> A   Through discussions with Mr. Henry. And he had sought other outside help.

> *      *      *      *      *      *      *

> Q   So as far as you were concerned --

> *      *      *      *      *      *      *

> Q   -- it was -- as long as it came from a damage award, it was excludable.

> A   For personal injury. Yes.

> Q   But what did the personal injury have to do with the matter?

> A   That's the character of the award.

> Q   In other words, if the damage was for personal injury, it was your understanding that it was excludable?

> A   Yes, sir.

Q   So consequently, if it was not for personal injury, then it would be includable, in your understanding?

A   Could you readdress that again?  If it wasn't --

Q   If the damage award was received for a cause of action which was not for personal injury, would that money be includable into income?

A   Yes.  I would think so.  Without seeing the actual, you know, ramifications of that thing, I would think so.

Q   What is your definition of personal injury?

A   In the case of Mr. Henry?

Q   I'm just asking you for a definition of personal injury.  You --

A   Okay.  In the case --

Q   -- referred to that term.

A   Okay.  In the case that we have with Mr. Henry it was for, basically, his character.  He was ruined.

Q   He was -- excuse me?

A   He was ruined.

The record establishes that Mr. Gargiulo did not make the determination that Mr. Henry received the $1,623,203 settlement payment from du Pont as damages for personal injury.  To the contrary, it was Mr. Henry who informed Mr. Gargiulo about the character of that payment.  On the instant record, petitioner has failed to show that he provided correct information to Mr. Gargiulo, his return preparer, and that the failure to include

the $1,623,203 settlement payment in petitioner's 1994 tax return was the result of Mr. Gargiulo's error.  On that record, we further find that petitioner's reliance on Mr. Gargiulo was not reasonable and that he did not act in good faith in relying on him.

We now address petitioner's contention that the state of the law was such when he filed his 1994 tax return in October 1995 that his position to exclude the payments at issue as income from that tax return was reasonable.  We disagree.  The Supreme Court decided both United States v. Burke, 504 U.S. 229 (1992), and Commissioner v. Schleier, 515 U.S. 323 (1995), before petitioner filed his 1994 tax return.  In both of those cases, the Supreme Court explained the requirements prescribed by section 104(a)(2) that damages be received "on account of personal injuries or sickness."  We have found on the instant record that petitioner has failed to establish (1) that the $1,623,203 settlement payment which he received from du Pont during 1994 was received on account of the loss of his business reputation or the loss of his reputation as an orchid grower and (2) that such losses constitute personal injuries within the meaning of section 104(a)(2).  We have also found that du Pont issued Form 1099-MISC for the $2,800,000 total settlement amount to Fred Henry's Paradise of Orchids and its attorneys in the lawsuit.

On the record before us, we find that petitioner has failed to show that there was reasonable cause and that he acted in good faith when he did not report the $1,623,203 settlement payment as income in his 1994 tax return.[7]

We have considered all of the contentions and arguments of petitioner that are not addressed herein, and we find them to be without merit and/or irrelevant.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered under Rule 155</u>.

---

[7]We find no basis whatsoever on the record before us for petitioner's position that the entire $1,623,203 settlement payment was paid to him on account of the loss of his business reputation and the loss of his reputation as an orchid grower.